**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>YAMIL CUEVAS-HERÁNDEZ,<br>Defendant. | CRIM. NO.: 24-190 (CVR) |

**REPORT AND RECOMMENDATION**

## I. INTRODUCTION

On May 22, 2024, a grand jury returned a six count indictment against Yamil Cuevas Hernández ("Cuevas" or "Defendant") for conspiracy and attempt to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii) and 846; attempt to possess and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii); maintaining premises to store and distribute cocaine, in violation of 21 U.S.C. § 856(a)(1); possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i); and being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1). ECF No. 17. Additionally, the indictment brings forfeiture allegations pursuant to 21 U.S.C. § 853(p) and 28 U.S.C. § 2461(c). *Id.*

On December 1, 2025, Defendant filed a motion to suppress evidence, alleging that there were pre-warrant entries into a home Defendant owned at DD4 Calle Zafiro at Urbanization Praderas de Navarro in Gurabo Puerto Rico ("DD4" or "target property") that were omitted from an affidavit submitted in support of the warrant application to search DD4. ECF No. 114. Defendant also argues that the search of a Chevrolet Colorado (the "Colorado") in the garage of

DD4 was outside the scope of the warrant. *Id.* While search three warrants were granted with respect to the investigation, one for DD4 and one for each of two vehicles associated with Defendant, he only alleges that suppression is justified with respect to any evidence seized as a result of the search of DD4 and the Colorado. The government responded on February 9, 2026, and Defendant replied on February 23, 2026. ECF Nos. 127, 130. An evidentiary hearing was held on August 17-19, 2026, on the motion to suppress. ECF Nos. 164-166. For the foregoing reasons it is recommended that Defendant's motion to suppress be GRANTED IN PART AND DENIED IN PART.

## II. Factual Background[1]

On May 16, 2024, the Federal Bureau of Investigation ("FBI") provided a masked man later identified as Defendant with 50 kilograms of sham cocaine contained in two duffel bags. ECF No. 171 at 60:8-61:8. In exchange the Defendant provided the undercover agent $400,000. *Id.*[2] at 61:26-62:8. The transaction took place prior to 11:30 am, after which Defendant placed the two bags of sham cocaine in a white Ford F-150 (the "F-150") he had arrived in. ECF Nos. 171 at 61:22-24, 62:6-7; ECF No. 174 at 17:1-4. He then drove away in the F-150. ECF No. 171 at 62:9-15. As he drove, he continued to be surveilled by law enforcement. *Id.* Defendant drove into the Urbanization Praderas de Navarro ("Praderas de Navarro"), specifically to the residence at DD4, although it is unclear whether he parked on the street where DD4 is located, on DD4's curtilage or

[1] Defendant in his motion frames the facts as beginning with an offshore drug transaction between undercover FBI agents and foreign drug traffickers. ECF No. 114 at 3. At the hearing these events were briefly discussed by Agent Urrutia, who acknowledged that the offshore transaction was related to the present case. ECF No. 174 at 11:8-15. However, that offshore transaction is not discussed here because it does not affect the analysis of whether suppression is warranted.
[2] Subsequently, under cross examination, Agent Urrutia explained the breakdown of what the $400,000 was intended for. *See* ECF No. 174 at 10:23-11:3.

inside DD4's garage.[3] *Id.* at 62:16- 63:8. DD4 is a one-story residential address with an attached garage. At the relevant times, including but not limited to before the search warrants were authorized (Exhibits, I, II, III), the garage door of DD4 was open and agents could observe that there was a grey Colorado inside the garage. ECF No. 171 at 72:14-22. Once there, Defendant exited the vehicle and entered DD4. *Id.* at 63:10-13. He did not bring either of the bags of sham cocaine into DD4; they remained in the back of the Ford F-150. ECF No. 174 at 24:5-7. After being inside the home for "a few minutes", he exited and drove away in the Ford F-150. ECF No. 171 at 72:14-22.[4]

After the F-150 left Praderas de Navarro, surveilling officers attempted to make a traffic stop and Defendant fled. *Id.* at 64:8-13. During the ensuing police chase, law enforcement lost sight of the F-150 and Defendant. *Id.* at 64:15-21. Eventually, the F-150 was located abandoned in the Municipality of San Lorenzo. *Id.* The two duffle bags of sham cocaine were located nearby to the truck, abandoned among some scrub. *Id. See also* Exhibit 2. Law enforcement in the area spoke to residents in the area and obtained security camera footage that showed that Defendant had exited the F-150 and boarded a Black Honda Pilot (the "Pilot"). *Id.* at 67:20-68:3. The driver of the Pilot was later identified as Melissa Nieves Rosario ("Nieves"), Defendant's wife.[5] *Id.* at 69:10-11. Officers still within Praderas de Navarro observed the Pilot return to DD4 with Nieves and Defendant exiting the vehicle and entering DD4. *Id.* at 68:3-11. After a short time, both exited the house and entered the Pilot once more. *Id.* Defendant had changed his clothes while inside

[3] Neither the evidence introduced at the suppression hearing nor the affidavit submitted in support of the search warrant application dispel this uncertainty.

[4] Defendant was not observed by law enforcement entering or exiting DD4 with anything illegal in his actual possession.

[5] Nieves in her testimony consistently referred to Cuevas as her husband. However, she noted that they are not legally married and did not live together at the time of the execution of the search warrant. ECF No. 173 at 11:12-13; *id.* at 12:9-15.

DD4. ECF No. 174 at 27:7-9.[6] From there they drove within Praderas de Navarro and law enforcement briefly lost sight of the Pilot. ECF No. 171 at 68:13-25. When law enforcement once again saw the Pilot, Nieves was the only occupant. *Id.* Law enforcement agents began to search for Cuevas inside the Praderas de Navarro neighborhood. *Id.* at 69:15-17. Nieves returned to DD4 in the Pilot. *Id.* at 68:1-4. She would later leave the house and drive out of Praderas de Navarro in the Pilot. *Id.* at 69:6-13. While leaving, she was stopped twice by police officers and let go with a citation, although the government attested that these two encounters represented a single stop by police. *Id.*

While looking for Cuevas, law enforcement agents were notified of another resident at Praderas de Navarro who was reporting that a man was attempting to break into her property. *Id.* at 70:16-19. Puerto Rico Police Bureau officers responded and apprehended Cuevas. *Id.* at 70:19-23. Cuevas provided the police the false name of Josué García Sánchez when he was arrested. *Id.* at 70:24-25. Federal agents later took custody of Defendant. *Id.* at 73:12-14.

After Defendant was in custody federal agents sought a search warrant for DD4, the F-150 and the Pilot. *Id.* at 71:17-24. *See also* Exhibits I, II, III. At no time did they seek a search warrant specifically for the Colorado. ECF No. 174 at 41:21-23. The warrants were granted at 8:29 pm on May 16, 2024. Exhibits I at 2, II at 2, II at 2. The warrant for DD4 was executed at 9:42 pm the same night. Exhibit 4.

That evening around 7:30 pm, prior to the issuance of the search warrants, Nieves returned in the Pilot to DD4. ECF No. 172 at 137:24-138:8. At that time agents were stationed on Calle

[6] Law enforcement agents did not observe Defendant entering or exiting DD4 with anything illegal in his actual possession.

Zafiro in front of DD4, but had not yet entered the property.[7] ECF No. 171 at 74:2-13. Nieves was at that time accompanied by a lawyer, Jaime Barceló ("Barceló"). ECF No. 172 at 137:6-138:8 Nieves asked agents if she could enter the property, which she identified as her home, to retrieve belongings for her children. ECF No. 171 at 75:4-17. Agents agreed to allow Nieves into the property, but required that she be accompanied by law enforcement officers. *Id.* at 75:19-76:9. Nieves then entered the home with her mother and three officers. *Id.* at 76:10-18. They remained in the home "a few minutes" while retrieving the items, which including clothing and two electronic tablets. *Id.* at 77:14; *id.*at 79:19-20. Upon exiting the home Nieves was asked to sign a consent form for the search of her phone and to turn over the same, which she did. ECF Nos. 171 at 78:4-79:8; 172. She was also asked to leave the keys to the Pilot with the agents, as they intended to search the car once a warrant was procured. ECF No. 171 at 79:11-16. She did this as well. *Id.* Then Nieves left with her mother at about 8:14 pm. ECF Nos. 171 at 79:24; 172 at 154:25-155:4. Her lawyer also left the scene at that time. ECF No. 171 at 79:25-80:1.

Once the warrant was authorized, law enforcement agents went into DD4 and began searching the property. *See* ECF No. 171 at 80:17-81:11. As part of the search of the property, agents also searched the attached garage. Inside that garage sat the Colorado. *Id.* at 91:24-25. Inside the trunk of the Colorado Special Agent Carlos Urrutia ("Agent Urrutia"), at the time a supervisor with the FBI, observed "several rifles, pistols, bricks of cocaine and a very large amount of cash money". *Id.* at 103:2-8. The Colorado was then sealed with evidence tape to be towed to the FBI headquarters in San Juan and searched further there. *Id.* at 103:20-104:23. The tow was completed that night, although the exact time is disputed. *Id.* at 171:1-6. The search at FBI headquarters began

---

[7] Nieves' own testimony is that agents were already inside the garage when she arrived. However, for the reasons explained below, Nieves' testimony is not credible insofar as it conflicts with the facts described here. *See infra* Section IV.D.

at 11:00 am the next morning, May 17, 2024. ECF No. 174 at 5:14-6:8. This search uncovered 16 kilograms of cocaine, 14 firearms and $994,000 cash in the trunk of the Colorado. *Id.* at 6:11-12.

## III. LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…." U.S. Const. amend. IV. With limited exceptions, it requires police officers and government agents to secure a search warrant supported by probable cause prior to effecting a search or seizure. *United States v. Paneto*, 661 F.3d 709, 713 (1st Cir. 2011). A search warrant application must demonstrate that there is probable cause to believe that (1) a crime has been committed—the "commission" element, and (2) the enumerated evidence of the offense will be found at the place to be search—the "nexus" element. *See United States v. Zayas-Díaz*, 95 F.3d 105, 111 (1st Cir. 1996). "With regard to the 'nexus' element, the task of a magistrate in determining whether probable cause exists is 'to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence will be found in a particular place.'" *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Generally, applications in support of a search warrant are "presumptively valid." *United States v. Barbosa*, 896 F.3d 60, 67 (1st Cir. 2018) (quoting *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013)). However, under *Franks v. Delaware*, a Defendant may be able to rebut that presumption. *Franks v. Delaware*, 438 U.S. 154. To do so, a defendant must show "by a preponderance of the evidence, that there were false statements included in the warrant affidavit and that, with the 'false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the . . . warrant must be voided and the fruits . . . excluded to the same

extent as if probable cause was lacking on the face of the affidavit.'" *Barbosa*, 896 F.3d at 68 (quoting *Franks*, 438 U.S. at 156). "Suppression of the evidence seized is justified if… the defendant proves intentional or reckless falsehood by preponderant evidence and the affidavit's creditworthy averments are insufficient to establish probable cause." *United States v. Tanguay I*, 787 F.3d 44, 48-49 (1st Cir. 2015).

In addition to falsity, material omissions from a search warrant may furnish a successful *Franks* challenge. For such a challenge to succeed, a defendant must show that "the omission must have been either intentional or reckless; and second, the omitted information, if incorporated into the affidavit, must be sufficient to vitiate probable cause." *Tanguay I*, 787 F.3d at 49. "[T]here is no requirement that every shred of known information be included in a warrant affidavit, the omission of a particular detail, without more, is not enough to satisfy the mens rea element of the *Franks* test." *Id.* Instead, it must be shown that the omissions were "designed to mislead, or... made in reckless disregard of whether [it] would mislead, the magistrate [judge] in his appraisal of the affidavit.". *Barbosa*, 896 F.3d at 68 (quoting *United States v. Colkley*, 899 F.2d 297, 300-01 (4th Cir. 1990)).

## IV. ANALYSIS

Defendant alleges that DD4 was searched prior to agents obtaining the DD4 search warrant. He also argues that the search of the Colorado found in the garage of DD4 was a warrantless search because the vehicle was not covered by the DD4 search warrant. However, first Defendant must demonstrate standing to challenge the search.

### A. STANDING TO CHALLENGE THE SEARCH

It is well established that a defendant making a motion to suppress under the Fourth Amendment must show that they have standing to challenge the evidence.[8] "[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (citing *Katz* v. *United States*, 389 U.S. 347, 353 (1967). "[T]he defendant must show both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable." *United States v. Mancini*, 8 F.3d 104, 107 (1st Cir. 1993). In addition, it is worth noting that the affidavit submitted in support of the search warrant at issue indicates that a subpoena was served to the administration of Praderas de Navarro, which revealed that the F-150 is registered to Cuevas for the purpose of having access to the community. Exhibit I, at 6, ¶24.

Here, Defendant has provided an unsworn statement under penalty of perjury that he is the owner of both the house at DD4 and the Colorado that was seized. ECF No. 114-1 at 16. Furthermore, Nieves testified that while Cuevas did not live in DD4 at the time of the search, the house was owned by him. ECF No. 172 at 130:13-14. According to her, Cuevas went in and out of DD4 as he pleased, without needing to seek specific permission from her. ECF No. 173 at 13:24-25. Furthermore, she testified that the Colorado belonged to Cuevas. ECF No. 172 at 130:17-21. This evidence is sufficient to provide Defendant with standing to challenge the search.

[8] "[T]he term 'standing' [is used] somewhat imprecisely to refer to this threshold substantive determination." *United States v. Sanchez,* 943 F.2d 110, 113 n.1 (1st Cir. 1991). Standing as used here is unrelated to the doctrine of standing to sue.

### B. The Arrest of "Josué García Sánchez"

Defendant also argues throughout the motion that the person arrested outside of DD7 in the midafternoon of May 16, 2024, was not him, but another man name "Josué García Sánchez".[9] This argument is baseless. Defendant was apprehended by Puerto Rico Police officers working with the FBI Task Force. ECF No. 174 at 19:1-10. Those officers who apprehended him did not initially know his identity as Cuevas. *Id.* Cuevas himself provided them a false name. However, the FBI identified Cuevas because he was one of two people listed as residents of DD4 at the Praderas de Navarro gatehouse. ECF No. 171 at 70:2-5. The F-150 was also registered as an authorized vehicle for DD4. *Id.* Agent Urrutia testified that the FBI was also able to check their databases and obtained Cuevas full name as well as pictures of him. *Id.* at 70:8-14. Finally, once Cuevas was arrested, he was found with a key that, when tested, started the F-150 abandoned in San Lorenzo. *Id.* at 71:1-13. Given the foregoing, law enforcement agents had ample evidence to conclude that the man they arrested was in fact Cuevas.

### C. The Seizure of the Chevrolet Colorado.

Defendant asserts that the Colorado from the garage of DD4 "was unlawfully searched and seized" because it was not mentioned in the warrant.[10] ECF No. 114 at 16. The DD4 search warrant does not explicitly mention the Colorado, even though two other search warrants based on the same affidavit specifically mentioned two other automobiles associated with Defendant. Despite this fact, after the DD4 search warrant was authorized, the Colorado was seized and taken to be

[9] Defendant almost in the same breath contends both that the affidavit in support of the search warrant hid from the magistrate judge that Defendant was already in custody, while also claiming that the arrest was of an unrelated individual. The allegation that Defendant's custody was omitted from the search warrant is also contradicted by the record. The affidavit in support of the search warrant clearly notes that the Defendant was already in custody at the time it was submitted. Exhibit I at ¶ 22 of the affidavit.

[10] Defendant remains adamant that the Chevy Colorado was subject to a K9 search prior to the execution of the warrant; however, Agent Urrutia testified that no agent ever entered the garage of DD4 until after the search warrant was authorized. ECF No. 174 at 101:23-102:5.

searched offsite after Agent Urrutia opened the trunk and saw drugs, firearms and cash inside. Once at the FBI headquarters, the Colorado was searched in depth, yielding a total of 14 firearms, 16 kilograms of cocaine and nearly one million U.S. dollars. Defendant argues that since the scope of the search warrant was exceeded, suppression of fruits from the search of the Colorado should follow.

Search warrants have limited scope that must not be exceeded. *Aponte Matos v. Toledo-Davila*, 135 F.3d 182, 190 (1st Cir. 1998). *See also Maryland v. Garrison*, 480 U.S. 79, 84 (1986) ("By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the [Fourth Amendment particularity] requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."). “If the scope of the search exceeds that permitted by the terms of a validly issued warrant… the subsequent seizure is unconstitutional without more.” *Horton v. California*, 496 U.S. 128, 140 (1990).

It is uncontested that the search warrants did not name the Colorado specifically, although there were search warrants for two other vehicles associated with Defendant. *See generally* Exhibits I, II, III. However, the Colorado was found in the attached garage of DD4. "Where a warrant authorizes the search of an entire property or premises, the scope of the warrant includes automobiles on the property or premises that are owned by or are under the dominion and control of the premises owner or which reasonably appear to be so controlled." *United States v. Silva*, 593 F. Supp. 2d 316 (D. Mass. 2009) (quoting *United States v. Patterson*, 278 F.3d 315, 318 (4th Cir. 2002)). *See also United States v. Pennington*, 287 F.3d 739, 744-45 (8th Cir. 2002); *United States v. Gottschalk*, 915 F.2d 1459, 1461 (10th Cir. 1990); *United States v. Percival*, 756 F.2d 600, 612 (7th Cir. 1985). Additionally, “[s]tructures that are ‘part of,’ ‘reasonably can be viewed as a part

of,' or 'deemed appurtenant to . . . though not physically a part of" the identified premises may all be swept into the scope of the warrant." *United States v. Rivera-Alejandro,* No. 09-165 (CCC), 2013 U.S. Dist. LEXIS 206216, at *14-15 (D.P.R. Aug. 7, 2013) (quoting *United States v. Fagan*, 577 F.3d 10, 13 (1st Cir. 2009) (internal citations omitted)). The attachment A-1 to the DD4 search warrant indicates that "[t]he residents [sic] to be searched is a one-story cream in color, with orange details, a garage to the right of the front door and four windows to the left. The TARGET PROPERTY located at URB PRADERAS DE NAVVARO [sic] DD4, Zafiro street Guarbo, Puerto Rico." Exhibit I at Attachment A-1. The attached garage, noted specifically in the warrant, was reasonably understood as part of the home. This is strengthened by the fact that the garage was connected to the home directly by a door into the kitchen. ECF No. 171 at 86:1-2. Hence, searching the Colorado parked in DD4's garage during the search of the home was pursuant to the warrant and did not infringe on the Defendant's right to be free of unreasonable searches. *See also United States v. Evans,* 92 F.3d 540, 543 (7th Cir. 1996) (holding that during a home search "a car parked in a garage is just another interior container, like a closet or a desk.").

Continuing this line of attack, Defendant argues that the search warrant for DD4 specifically sought permission to search the two other vehicles. According to Defendant, the failure to secure a specific search warrant for the Colorado means that "the Government cannot plausibly claim it believed the residence warrant automatically authorized searching any other vehicle later encountered in the garage". ECF No. 130 at 6. The fact is, however, that the warrant did authorize the search of DD4, which as a matter of law includes any vehicle parked at DD4's premises. The choice to obtain separate search warrants for the F-150 and the Pilot may in fact have been unnecessary should those two vehicles have been located on the property at the time the search warrant was executed, but there was no guarantee that they would be at DD4 then. The

government's care in seeking search warrants for the F-150 and the Pilot, however, does not reduce the scope of the DD4 search warrant.

Defendant argues that *Collins v. Virigina* 584 U.S. 586, 601 (2018) forecloses the possibility that a garaged vehicle can be treated like any other interior container in the home. Defendant's reliance is inapposite. *Collins* held that the automobile exception to the warrant requirement did not allow for a warrantless examination of a motorcycle parked in the curtilage of a home. *Collins*, 584 U.S. at 601. The reasoning was that, while the automobile exception alone may justify a warrantless search when only the defendant's privacy interest in the vehicle is being implicated, a vehicle parked in the curtilage is also covered by a defendant's legitimate expectation of privacy in their home and the curtilage thereto. *Id.* at 594. Therefore, an officer that warrantlessly inspects a vehicle in the curtilage of a home is infringing on the defendant's Fourth Amendment protections with respect to the home. *Id.* This has no bearing on the present case because law enforcement agents searched the target property pursuant to a search warrant aimed at DD4, the residence where the Colorado was parked. Hence, *Collins* is not implicated.

Defendant also suggests that the fact that the Colorado was seized and searched offsite was unconstitutional. However, it is difficult to differentiate this argument from Defendant's insistence that a search of the Colorado was not authorized by the warrant for DD4 at all. Neither party cites any authority as to whether towing a car offsite when it could be searched in a garage pursuant to a search warrant is a violation of Defendant's Fourth Amendment rights. Insofar as this is what Defendant argues, the weight of authority disagrees with him. When vehicles are being searched pursuant to the automobile exception (i.e., without a warrant), law enforcement is entitled to move the vehicle to be searched offsite. *See United States v. Polanco*, 634 F.3d 39, 43 (1st Cir. 2011) ("[A]n impressive convoy of auto-exception cases holds that if the requisite probable cause exists

it matters not whether the vehicle was already parked, whether it was searched at another locale, or even whether agents had time to obtain a warrant first."). In such cases, relocation of the vehicle does not "deprive the officers of probable cause to search." *United States v. López*, 380 F.3d 538, 545 (1st Cir. 2004). "Moreover, the search, so long as reasonable in scope, need not be conducted contemporaneously with the seizure." *United States* v. *Panitz*, 907 F.2d 1267, 1271 (1st Cir. 1990). Given this background, it is reasonable to conclude if a vehicle can be moved elsewhere to be searched based on merely the probable cause determination of the police, then it likewise may be justified by the surer finding of probable cause by a judicial officer when authorizing a search warrant for a residence where the vehicle is parked.

Finally, Defendant describes a potential irregularity that occurred during the towing of the Colorado. The route from DD4 to FBI headquarters, where the Colorado was ultimately searched, is normally a drive of just over 20 minutes long. *See* Exhibit G-3. Defendant points to the tow record from the police of Puerto Rico that in his mind shows that the tow took over two hours. Exhibit CC-2. However, Defendant's evidence does not say as much as he implies. The tow record for the Colorado notes a departure time of 12:30 am and an arrival time of 2:45 am, but not where the tow truck departed from or arrived to. *Id*. Defendant's witness, Janeliz Rodríguez ("Rodríguez"), with respect to Exhibit CC-2 was not the person who made the record, but was instead a private investigator retained by Defendant. She asserted that the departure and arrival time listed on the record must indicate when the Colorado left DD4 and when it arrived at the FBI headquarters. ECF No. 172 at 69:23-70:6. However, she did not satisfactorily explain how she came to that conclusion. The document could just as easily indicate the departure of the tow truck from the tow yard and its return to the tow yard. Rodríguez admitted she had not interviewed the tow truck driver who made Exhibit CC-2 and that she understood that 12:30 am was the time the

tow truck left Praderas de Navarro because it was compatible with the time stamps on the security camera footage she reviewed of the tow truck leaving the neighborhood. ECF No. 172 at 110:7-25. However, the accuracy of those timestamps was also materially impeached. *See* ECF No. 171 at 48:12-49:22. Therefore, it is not clear how long the tow between Praderas de Navarro and FBI headquarters took.

Even assuming the tow did take two hours and fifteen minutes, that itself does not warrant suppression. Defendant provides no authority for the proposal that this discrepancy has any bearing on a motion to suppress. On the contrary, the amount of time it took to tow the Colorado, more akin to chain of custody issues, are matters that go to the weight of the evidence rather than its admissibility. *See e.g. United States v. Barrow,* 448 F.3d 37, 42 (1st Cir. 2006). Defendant also argues that it should be assumed due to the lengthy tow that something untoward occurred while the Colorado was in the garage or in transit. *See* ECF No. 174 at 116:7-123:3. Without any positive evidence of such activity there is no reason to assume that the government acted unconstitutionally in any way during the towing. Therefore, Defendant is not entitled to suppression on the basis of the search or towing of the Colorado.

### D. Whether there was an Unlawful Pre-Warrant Entry into DD4 and Search.

Defendant asserts that the failure of police to disclose the pre-warrant entries into DD4 was a material omission from the warrant application affidavit that taints the probable cause determination by the court. Furthermore, he argues that it was not merely entries, but searches that occurred prior to the warrant being issued. He provides the following evidence that in his opinion demonstrates that "[f]ederal and state law enforcement officers entered the residence at DD4 Calle Zafiro hours before the warrant was issued [and] occupied the curtilage without judicial

authorization…". ECF No. 114 at 1. First, he asserts that video evidence, logs from the entrance to the Praderas de Navarro, and incident reports from security services at Praderas de Navarro demonstrate law enforcement agents were at the DD4 prior to the 9:42 pm execution of the warrant. *See* Exhibits 23 at 00:14:37-00:16:30, H 8-15. This evidence does not say as much as Defendant suggests. It merely reveals that law enforcement agents were entering the neighborhood through the morning and afternoon of May 16, 2024. They do not show that the police were inside DD4. At most, it demonstrates, that agents arrived early to Praderas de Navarro. Whether they were there to conduct surveillance, to do a knock and talk at DD4, or arrest someone is not something that can be speculated simply because law enforcement agents entered a neighborhood. Nor should these exhibits be understood to evidence that law enforcement agents infringed on the curtilage of DD4 either. Curtilage is understood to be the "the area 'immediately surrounding and associated with the home'". *Florida v. Jardines*, 596 U.S. 1, 1 (2013) (internal quotations omitted). "[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage -- as the area around the home to which the activity of home life extends -- is a familiar one easily understood from our daily experience." *United States v. Dunn*, 480 U.S. 294, 302 Applying the factors elucidated in *Dunn*, the Paderas de Navarro neighborhood itself is clearly not part of the curtilage of DD4. These factors are "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301. Here, the whole neighborhood is overbroad and too distant from the home to be curtilage. While the community is gated, that gate allows plenty of people into the neighborhood, both other residents of the community as well as members of the public, without regard to the wishes of the single homeowner. The nature of the

area is public; within a gated community there are sidewalks and roads used by all members of the community and some of the public at large. Finally, Defendant has not stated that he has taken any steps to protect the area from observation because, as noted, he does not have the authority to unilaterally control the whole neighborhood. *See United States v. Harris*, 6 Fed. Appx. 304, 308 (6th Cir. 2001) (treating gated communities the same as ungated communities for the purposes of Fourth Amendment reasonable expectation of privacy analysis). Therefore, evidence showing that law enforcement were in the neighborhood, while relevant, is insufficient in and of itself to demonstrate an intrusion onto the protected curtilage of DD4.

The next piece of evidence Defendant presents are photos taken by officers at DD4 which Defendant characterizes "show[] daylight entries inconsistent with the FBI's 9:42 p.m. execution time…", including the use of a K9 unit prior to the issuance of the search warrant. ECF No. 114 at 15; 114-1 at 30-34, 116-123[11]. Defendant did not explore this argument at the evidentiary hearing, but bears discussing briefly. Photographs during daylight hours from inside the home would suggest that a search had occurred prior to the DD4 warrant being executed, since the warrant was only executed at 9:42 pm and ended before dawn. Exhibit 4. However, none of the photographs admitted into evidence actually demonstrate that the search took place in daylight. In fact, the opposite is true. Every photo with a view out from an external window shows nighttime outside. *See* Exhibit J-1, J-3 through J-6, PP-3, PP-5. Furthermore, the testimony of Agent Urrutia, who was the only member of law enforcement who testified at the hearing, likewise contradicts this interpretation. Agent Urrutia stated plainly that no law enforcement agents entered the garage of DD4 prior to the execution of the search warrant. ECF No. 174 at 101:23-102:5.

[11] In reply, Defendant also cites to the photographs of DD4 appended to the search warrant itself. ECF No. 130 at 5; 114-1 at 68. These photos were taken in daylight but were clearly taken from the paved street outside the house, not from within the curtilage of DD4.

Defendant's last piece of evidence that there was a pre-warrant search of DD4 is the testimony of his wife Nieves. Nieves testified that at around 7:20 pm she arrived outside of Praderas de Navarro and met with Barceló, an attorney. ECF No. 172 at 137:22-138:1. They each drove into the neighborhood, Nieves parking on the driveway of her home. *Id.* According to Nieves, she did not pull all the way into the garage, as is her custom, due to the presence of federal agents inside the garage of DD4. *Id.* at 138:22-139:4. Upon getting out of her car she was asked to step away from the vehicle and was told she could not touch anything. *Id.* at 140:22-141:1. She was told to give officers her cell phone which she did. *Id.* at 143:1-15. She eventually was allowed into the house with an escort. *Id.* at 144:5-9. She brought Barceló and her mother, who had by then also arrived at DD4 into the home with her. *Id.* at 145:3-6. She reported that three law enforcement agents accompanied her as well. *Id.* She went to her children's room and began to pack items. *Id.* at 145:9-14. While there, she could hear other people coming and going in the house. *Id.* at 146:13-16. She identified these people as agents because they were speaking English to each other. *Id.* at 147:18-148:22. Nieves also testified that she could hear them in particular rooms of the home because she recognized the sounds of particular doors, normally left closed, being opened. *Id.* After retrieving her needed items, she went into the living room where she saw an indeterminate number of agents in the living room. *Id.* 151:8-18. After exiting DD4, she asked agents if she could retrieve her purse from the Pilot. *Id.* at 151:19-23. The agents opened the car and got her purse. *Id.* at 151:24-152:7. Before providing it to her they turned it out and looked through the contents. *Id.* After that Nieves left DD4 with her mother. *Id.* at 153:25.

Nieves' testimony that there was a warrantless search of the property is the primary testimony Defendant relies on when making his *Franks* challenge. However, Nieves' testimony was generally not credible. Details of her entry into the home to collect her children's things were

discredited by other witnesses. Most significantly, Nieves testified that a total of 6 people entered DD4 with her. These were Nieves, her mother, Nieves' attorney Barceló and the three law enforcement agents. However, Barceló, who also testified at the hearing via video teleconference (without any objection from the parties), indicated that at no point did he enter the home. *Id.* at 41:4-6.[12] Instead, when Nieves and her mother went into the home, he remained outside. Agent Urrutia also testified that Barceló stayed with him outside the house when Nieves went inside. ECF No. 171 at 76:25-77:8. Likewise, as to the agents in the garage of the home, Agent Urrutia testified that at no point prior to the execution of the warrant did any law enforcement officers enter the garage, contradicting Nieves. ECF No. 174 at 101:23-102:5. Agent Urrutia was himself present on site at the time that Nieves arrived and was one of the agents that spoke with her and her lawyer. ECF No. 171 at 74:22-24. Finally, she testified that after picking up her husband in San Lorenzo she left him sitting on the furniture at DD4. ECF No. 172 at 133:8-9. This statement is in tension with the testimony of Agent Urrutia, who stated that surveilling law enforcement saw Nieves and Cuevas leave together. ECF No. 171 at 68:9-16.

Furthermore, Nieves recounted the story of picking up her husband in San Lorenzo. According to her, her husband called her asking to be picked up because he had been left afoot. Nieves testified that, while she did pick him up as he requested, at no point did she ask what had happened such that Cuevas had been left on foot. ECF No. 173 at 21:6-16. Nor did she or Cuevas call a tow truck for the F-150 that Cuevas abandoned on the road. *Id.* Her failure to inquire even slightly strains her credulity.

[12] Barceló's testimony was that his memory of the event was poor, but he was clear on the point that he did not enter the home.

Finally, there is the matter of the Nieves' written sworn statements submitted prior to the hearing. Nieves first produced a sworn statement in support of the motion to suppress evidence. ECF No. 114-1 at 11-15.[13] However, that statement was materially incomplete due to what Defendant characterized as scanning error. The result was that a portion of paragraph eight was clearly missing from the document. Pursuant to a court order, Defendant provided a "Corrected and Complete" version of the Nieves statement. ECF No. 138-1. Despite Defendant's assertion that the statement was only different in that it contained the full English-language paragraph eight, the statement altered the hour at which Nieves went to pick up Defendant. Upon this inconsistency being pointed out, a third version of the statement was proffered which contains both the full paragraph eight and the original pickup time. ECF No. 142. This error, which the defense claims to be merely clerical, underscores the inconsistent nature of Nieves' testimony. Therefore, Nieves' testimony as to the four agents being in the garage when she arrived at the home as well as her testimony about agents, beyond the three who initially accompanied her into DD4, being present in the home is not credible. Given the factual finding that the only pre-warrant entry into DD4 was when Nieves was accompanied by three law enforcement officers to obtain her children's items from DD4, the discussion is cabined to the effect of that entry. Additionally, despite Nieves' testimony of pre-warrant searches of DD4, she did not identify during her testimony any fruits of the alleged search of either the Colorado or of the interior of DD4.

The government does not dispute that pre-warrant entry into DD4 occurred when agents escorted Nieves into DD4. However, it argues that agents' entry into the home accompanying Nieves was constitutional. As they state in the opposition to the motion to dismiss:

---

[13] Citations to Exhibits to the motion to suppress use their page number provided by CM/ECF rather than their page number as marked by Defendant.

> [T]he Supreme Court has held that, where officers have probable cause, they may temporarily secure an individual's home and prevent unaccompanied reentry into the home during the brief period of time necessary to secure a search warrant." *United States v. Mumme*, 985 F.3d 25, 38 1st Cir. 2021) (emphasis added) (citing *Illinois v. McArthur*, 531 U.S. 326, 331-33 (2001) (holding that such a seizure is reasonable under the Fourth Amendment because it is limited in time and scope and justified by the important law enforcement interest in preventing the destruction of evidence during the time necessary to secure a warrant).

ECF No. 127 at 13. The point that agents may have been legitimately entitled to prevent pre-warrant entry and require that Nieves be escorted into DD4 is well taken. However, Defendant's argument is not simply that agents entered the home, whether wrongfully or not, but that the information that they did never made its way to the affidavit examined by the magistrate judge who ultimately issued the warrant for DD4. It is because of this failure that Defendant argues that suppression is warranted. Insofar as Defendant argues that the evidence he seeks to suppress was a result (whether an immediate result or as fruit of the poison tree) of a pre-warrant search, suppression is not justified because Nieves' testimony that a pre-warrant search occurred was not credible and none of the pertinent exhibits introduced into evidence support a finding that a pre-warrant search of DD4 or the Colorado occurred.

Here, no pre-warrant search occurred. Since no pre-warrant search occurred, such a search could not have been omitted from the affidavit in support of the search warrant for DD4. Furthermore, Nieves' entry escorted by agents to obtain clothing for her children is immaterial as to whether there was probable cause to search DD4. Therefore, no evidence should be suppressed merely because the agents escorted Nieves into DD4 before the search warrant was authorized.

### E. Lack of Nexus to DD4 and Material Omissions from the Affidavit in Support of the Application of the Search Warrant.

While there was no pre-warrant search concealed from the court when the DD4 search warrant was sought, there was a lack of nexus between Defendant's drug trafficking activity and DD4. Despite the fact that Defendant does not argue this point cohesively, it was made clear in the questions he posed to Agent Urrutia as well as his arguments at the end of the suppression hearing. During the cross examination of Agent Urrutia the following exchange occurred:

> Q: Now was Mr. Cuevas observed getting out of the vehicle with packages, firearms?
>
> A. He was not.
>
> Q. So he just got out of the vehicle and went into the house not carrying anything, correct?
>
> A. Correct.

ECF No. 174 at 24:5-10.

Likewise, in the arguments made at the end of the hearing defense counsel said "The transactions that provoked the indictment when he went to his home, the duffle bags with the sham cocaine were somewhere in San Lorenzo thrown out. There's no evidence. That never made it to his home… They had already seized the two duffle bags that have the 50 sham cocaine in them, the kilos in them." ECF No. 174 at123:15- 124:16.

This argument is essentially that there was no nexus between Defendant's criminal activity and DD4.

> "A warrant application must demonstrate probable cause to believe that (1) a crime has been committed -- the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched -- the so-called 'nexus' element." *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999). In determining whether the nexus element is satisfied, a magistrate [judge] has to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a

crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

*United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005). “[R]eviewing courts generally afford substantial deference to a magistrate [judge]'s determination of probable cause…” *Roman*, 942 F.3d 4at 50. “The inquiry is not whether ‘the owner of the property is suspected of crime’ but rather whether ‘there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought.’ *Id.* (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)).

Here, the non-boilerplate portion of the affidavit in support of the DD4 search warrant application is, to put it mildly, succinct. Here are the highlights: On May 16, 2024, the Defendant was provided 50 kilograms of sham cocaine by undercover FBI agents. Exhibit I at 4 ¶13. Defendant was in the F-150 at that time. *Id.* “The Communications with co-conspirators were conducted using cell phones”. *Id.* The affidavit does not make it clear if Defendant used a cell phone to communicate with co-conspirators, or if it was the undercover agents using cell phones to communicate with Defendant’s co-conspirators. Defendant then went straight to DD4 at the Urbanization Praderas de Navarro. *Id.* at 4-5 ¶14. The reader is not told where he parked, whether on the street, in the curtilage or in the garage. He enters DD4, exiting about 10 minutes later. *Id.* at 5 ¶14-15. The affidavit does not say that anything illegal – or even a bag – was on his person when he entered or exited DD4. He gets back in the F-150 and drives away. *Id.* While driving he evaded the police stop and police lost sight of him. *Id.* at ¶16. The F-150 was then found abandoned in San Lorenzo; the two duffle bags “given to” him were found on the ground near the F-150. *Id.* at ¶17. This is the first mention of these “duffle bags”. It is not communicated whether these duffle bags were full, empty or somewhere in between. CCTV footage obtained by law enforcement shows that Cuevas exited the F-150 and boarded a Honda Pilot driven by Nieves. The affidavit

does not mention any illegal – or even a bag – on the person of Cuevas depicted in the CCTV footage. Cuevas returns to DD4 in the Pilot, now with Nieves. *Id.* at ¶19. They enter the home together and leave after a short time. *Id.* at ¶19-20. Once again, the affidavit does not say that anything illegal – not even a bag – was seen on Cuevas' person when he entered or exited DD4. They enter the Pilot and drive away. *Id.* at ¶20. Surveillance loses contact with the Pilot. *Id.* When they see the Pilot again, Nieves is the only occupant. *Id.* at 6 ¶20. Approximately, 45 minutes after this, Cuevas is arrested attempting to break into a home in Praderas de Navarro. *Id.* at ¶21. A key is found on him that fits the F-150. *Id.* at ¶23. It is also revealed that the F-150 is registered to Cuevas for the purpose of accessing Praderas de Navarro. *Id.* at ¶24. The remainder of the affidavit is boilerplate language.

Even under a deferential standard, there is no evidence of contraband coming into or out of DD4. The First Circuit has "expressed skepticism that probable cause can be established by the combination of the fact that a defendant sells drugs and general information from police officers that drug dealers tend to store evidence in their homes." *United States v. Bain*, 874 F.3d 1, 23-24 (1st Cir. 2017). Additionally, they have rejected per se rules permitting the search of a defendant's home when there is evidence that defendant has engaged in drug trafficking. *United States v. Khounsavanh*, 113 F.3d 279, 285 (1st Cir. 1997). Rather, specific observations connecting the home and the drug trafficking activity are required. *Roman*, 942 F.3d at 52. Here, the only connection between the drug trafficking activity and DD4 is Cuevas' brief presence at the home in the aftermath of a drug transaction. That does not, standing merely with the fact that Cuevas engaged in a drug transaction, provide probable cause that there was evidence of drug trafficking

at DD4.[14] Evidence that the defendant "move[d] back and forth from his residence in relation to drug transactions…" can sometimes be sufficient to make a finding of probable cause. *Ribeiro*, 397 F.3d at 51. However, such evidence is more than what is present in this affidavit. In *Ribeiro*, the defendant participated in four controlled buys with police and the affidavit established that he had left a particular address before travelling to three of those controlled buys. Here, we have a single controlled buy and Defendant only went to DD4 after engaging in the drug transaction.[15] Thus, even under a deferential standard this affidavit is devoid of probable cause to search DD4.

Even if, *arguendo,* one were to deem such a barebones affidavit sufficient to meet the probable cause threshold, whatever smidgin of probable cause existed that evidence of drug trafficking would be found at DD4 would have been vitiated by two facts that were omitted from the affidavit. *See Barbosa*, 896 F.3d at 69 (quoting *Tanguay I*, 787 F.3d at 48-49). The first of these is that the affiant omitted that Cuevas, upon arriving at DD4 after the drug transaction, did not bring either of the two duffle bags with sham cocaine with him into the residence.[16] Exhibit I, at 4-6. Nor did he bring any bags whatsoever, such that agents might suspect that he had contraband on him. *Id.* It was also omitted from the search warrant that both duffle bags of sham cocaine were recovered, with the full amount of sham cocaine still inside them, in the area where Cuevas abandoned the F-150 in San Lorenzo. *Id.* Hence, there was no reason for law enforcement to think that they would find even a few bricks of sham cocaine in DD4. All of these facts were uncontested at the hearing. ECF No. 174 at 26:7-11; 20:16-21.

---

[14] Also of concern is that the DD4 search warrant authorized a search for firearms. No facts in the affidavit link Cuevas to a firearm at any point.

[15] Moreover, the agents already had Cuevas under custody and even possession of the f-150 keys, so there was no need to go into the house to look for the keys of the vehicle or even Cuevas himself.

[16] Once again, the affidavit does not say where the F-150 was parked, so it cannot be assumed that it was in DD4's garage.

"Because there is no requirement that every shred of known information be included in a warrant affidavit, the omission of a particular detail, without more, is not enough to satisfy the mens rea element of the *Franks* test." *Barbosa*, 896 F.3d at 69. "Rather, an omission triggers the exclusionary rule only if it is 'designed to mislead, or . . . made in reckless disregard of whether [it] would mislead, the magistrate [judge] in his appraisal of the affidavit." *Id.* (quoting *United States v. Colkley*, 899 F.2d at 300-01). Here, the omitted information was withheld recklessly because each of these facts were known or with reasonable diligence should have been known, to the FBI at the time they sought the search warrant for DD4.[17] *Id.* The government has not presented good cause for omitting this information. There was no exigency alluded to at the hearing; the defendant was in custody and the sham cocaine recovered by the time the search warrant was sought. *Id.* at 20:16-21. To be sure, in hindsight agents were stationed outside a house that had a vehicle with a large amount of drugs, cash and firearms inside, which could have presented a danger to those agents securing the perimeter of the property. However, this fact was not known to agents at the time and the additional work to include the omissions mentioned above was merely the time it took to write them. This is not a case wherein the only evidence of recklessness is the fact that the information was omitted; the government both knew the relevant information and should have understood the relevance of the information. *Tanguay I*, 787 F.3d 44, 48-49 (1st Cir. 2015). The predicate drug trafficking activity in the affidavit was that Defendant received 50 kilograms of sham cocaine; the fate of the sham cocaine is obviously relevant.

---

[17] Agent Urrutia testified that they did not immediately open the duffle bags once they were recovered. ECF No. 174 at 18:10-13. He did not testify when exactly it was realized that all the sham cocaine was still within them. However, this does not excuse the failure of the affiant to inform the court that all the sham cocaine had been recovered in its entirety. The sham cocaine was stored in 50 bricks. Counting the bricks in the bags and ensuring that they had not been tampered with would have been a relatively simple, non-time consuming task..

Although the affidavit in support of the search warrant application was already lacking in probable cause as to the nexus between DD4 and the transaction of sham cocaine, with this omitted information, it would have been clearer to the court that there was no indicia of DD4 being used for drug trafficking activities. Including the omitted details, Cuevas' arrival at DD4 is shown to be less as an extension of his drug trafficking activity and instead an unrelated stopover on his way to stow the drug elsewhere. "Where '[a]llegations of … omissions" are proven true, we owe 'no deference to a magistrate's decision' because this 'implicate[s] the very truthfulness, not just the sufficiency, of a warrant application.'" *United States v. Roman*, 942 F.3d 43 (1st Cir. 2019) (quoting *Burke v. Town of Walp*ole, 405 F.3d at 82 (1st Cir. 2005)). Thus, in the alternative, looking at the reformed affidavit including these missing facts, there is no probable cause that evidence of a crime would have been found at DD4.

It should be noted that the government did have information that could have led to a finding of probable cause that evidence of a crime was within DD4. After Cuevas and Nieves arrived in the Pilot, Cuevas changed his clothing while inside DD4. This means that the clothes he wore during the drug transaction were likely within the home (and indeed were later found inside DD4). However, this information was not included in the affidavit. To consider it ex post would be to retroactively allow the government to supplement an affidavit after a search warrant has been executed. Additionally, neither the affidavit nor evidence received at the evidentiary hearing confirms where the F-150 was parked when it arrived at DD4 after the drug transaction. If it had, for example, been parked in the DD4's open garage, this may have assisted in coming to a finding of probable cause, since the sham cocaine, which the Defendant believed was cocaine, would have entered the home. However, this information was also not provided in the affidavit. The affidavit does not even state that the F-150 was parked in DD4's driveway.

Finally, the good faith exception as articulated under *United States v. Leon*, 468 U.S. 897 (1984) does not apply in this case. Suppression is a remedy to "to deter deliberate, reckless, or grossly negligent conduct." *Herring v. United States*, 555 U.S. 135, 144 (2009). "But given the rule's substantial social costs, exclusion is improper when the officers who conducted the search acted in objective good faith or their transgressions were minor." *United States v. González-Arocho*, 181 F.4th 168, 174 (1st Cir. 2026) (internal quotations omitted). "[S]uppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Leon*, 468 U.S. at 926. I do not make a finding of dishonesty. However, the government recklessly omitted relevant information that they had in their possession from the affidavit to be reviewed by the court. Knowing that the DD4 search warrant was authorized based on an incomplete picture of the situation, the government cannot now claim that they acted in good faith. Therefore, the good faith exception does not apply.

## V. CONCLUSION

For the reasons provided above, it is recommended that Defendant's motion to suppress be GRANTED IN PART and DENIED IN PART. In view that there was no unlawful pre-warrant search of DD4, the request to suppress evidence on that basis should be DENIED. Due to the lack of nexus between DD4 and Defendant's drug trafficking activity, suppression should be GRANTED as to any items seized either at DD4 or in the Colorado as a result of the execution of the search warrant for DD4. Defendant also requests that testimonial evidence be suppressed, although he identifies no statements at issue. As to any statement made prior to Defendant's arrest, the request for suppression should be DENIED. As to any statements made between Defendant's arrest and the execution of the search warrant, suppression should also be DENIED. Insofar as

Defendant argues for suppression of statements made after the execution of the search warrant, suppression should be DENIED for lack of specification and perfunctory argumentation.

The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); *see also* 28 U.S.C. § 636(b)(1); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 11th day of September 2026.

s/Marcos E. López
U.S. Magistrate Judge