**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

Plaintiff,

v.

YAMIL CUEVAS-HERNÁNDEZ,

Defendant.

CRIM. NO.: 24-190 (CVR)

**REPORT AND RECOMMENDATION**

## I. INTRODUCTION

On May 22, 2024, a grand jury in the District of Puerto Rico returned an indictment charging Defendant Yamil Cuevas-Hernández ("Defendant" or "Cuevas") with conspiracy and attempt to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii) and 846; possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii); maintaining a drug involved premises, in violation of 21 U.S.C. § 856(a)(1); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). ECF No. 17. Additionally, the indictment brings forfeiture allegations against the Defendant for property used to commit or facilitate, or derived from, Defendant's drug trafficking activities and possession of firearms. *Id.*

On December 1, 2025, Defendant filed both a motion to suppress (ECF No. 114) and motion to dismiss the indictment. ECF No. 113. This report addresses the motion to dismiss. A separate report has been made for the motion to suppress evidence. *See* ECF No. 175. First among the alleged grounds for dismissal is that the government committed "outrageous government

misconduct" when undercover Federal Bureau of Investigation ("FBI") agents participated in bringing cocaine into Puerto Rico. *Id.* at 15. Next, Defendant asserts what he deems to be multiple instances of prosecutorial misconduct that require dismissal. *Id.* at 18. Defendant then argues that he was selectively prosecuted when other known drug traffickers were not prosecuted. *Id.* at 20. Defendant also contends that there were Fourth Amendment violations before and during the execution of a search warrant on a home that Defendant owned. *Id.* at 20. He argues that the indictment is not specific enough and that he can neither prepare a fair defense nor ensure that he will not be subject to double jeopardy due to that vagueness. *Id.* at 24. Finally, he argues that dismissal is warranted because agents broke the law themselves during their investigation. *Id.* at 26.

## II. Legal Standard

Fed. R. Crim. P. 12(b) permits a party to "raise by pretrial motion any defense, objection or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). With that said, dismissal of the indictment under rule 12(b) is "reserved for extremely limited circumstances" because it "directly encroaches upon the fundamental role of the grand jury." *Whitehouse v. United States District Court*, 53 F.3d 1349, 1360 (1st Cir. 1995) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263, (1988)). "[A] court must deny a motion to dismiss if the motion relies on disputed facts." *United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018).

To evaluate a motion to dismiss, "courts take the facts alleged in the indictment as true, mindful that 'the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense.'" *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir.

2015) (quoting *United States v. Savarese,* 686 F.3d 1, 7 (1st Cir. 2012)). "[C]ourts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations[.]" *United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011).

## III. ANALYSIS

### a. Defendant's Request for a Hearing

In addition to Defendant's request to dismiss the indictment, Defendant also asks the Court to order a "full evidentiary hearing". ECF No. 113 at 29. As the First Circuit succinctly explained:

> We have long reprised that even a criminal defendant "is not entitled as of right to an evidentiary hearing on a pretrial or posttrial motion." *United States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993). Therefore, to garner such a hearing, we've explained that a defendant "carr[ies] a fairly heavy burden of demonstrating a need for [such] special treatment." *Id.*; *see also United States v. Panitz*, 907 F.2d 1267, 1273-74 (1st Cir. 1990) (collecting cases).

*United States v. Carbone*, 110 F.4th 361, 378 (1st Cir. 2024). Additionally, "the decision of whether to conduct an evidentiary hearing is left to the sound discretion of the district court." *United States v. Brown*, 621 F.3d 48, 57 (1st Cir. 2010) (quoting *United States v. Calderon*, 77 F.3d 6, 9 (1st Cir. 1996)).

Although a hearing was held regarding the motion to suppress evidence to address any Fourth Amendment violations, with respect to the arguments pertaining to the motion to dismiss that are not based on alleged Fourth Amendment violations the Defendant and the government agree on the material facts. Where the government and Defendant break with each other is as to what should be inferred from those facts. Therefore, the motion to dismiss can be ruled upon without a hearing.[1]

[1] Although the hearing regarding the motion to suppress was not meant to encompass the motion to dismiss, at the conclusion of the hearing defense counsel made arguments in support of dismissal of the indictment.

**b. Allegations of Misconduct by Law Enforcement Agents**

Defendant asserts that the conduct of FBI agents in bringing drugs into Puerto Rico amounts to outrageous government misconduct. Defendant's arguments on this point go substantially beyond the allegations contained in the indictment. For that reason, additional factual allegations are drawn from the motion to dismiss itself. As mentioned, there are no material facts in controversy for purposes of evaluating the pending dispositive motion.

In May of 2024, undercover agents infiltrated a drug-trafficking organization. ECF No. 113 at 5. Meeting with drug traffickers in Puerto Rico, a deal was reached in which undercover agents would take money from a drug dealer in Puerto Rico, transport that money to sea and trade with offshore drug traffickers from Tortola in the British Virgin Islands. *Id.* In fulfillment of this plan, agents received $500,000 from a drug trafficker in Puerto Rico[2] and in exchange agreed to deliver 575 kilograms of cocaine from offshore traffickers in possession of said cocaine. *Id.* at 6. The undercover agents journeyed to sea and met with offshore drug traffickers who provided the promised 575 kilograms of cocaine to the undercover agents. *Id.* After making this swap, the undercover agents returned to Puerto Rico. *Id.* at 7. Once there, they provided 50 kilograms of sham cocaine to the Defendant. *Id.* Defendant then asked if the undercover agents could obtain 900 additional kilograms of cocaine the following Sunday. *Id.*

The Supreme Court recognized in *United States v. Russell* the possibility of an outrageous government misconduct claim. 411 U.S. 484 (1973). In their words "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that

[2] The United States in its response to the motion to dismiss argues that the person who supplied the undercover agent the $500,000 was the Defendant himself. ECF No. 126 at 2. If that is true, it demonstrates further that this was not agents creating the crime as Defendant claims. However, even crediting Defendant's narrative that the $500,000 was supplied by the Puerto Rico drug trafficking organization in general, the government's behavior still does not rise to the level of outrageous misconduct.

due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction…" *Id.* Such a case would be one that violates "fundamental fairness, shocking the universal sense of justice." *Id. (quoting Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960)). Since *Russell*, the First Circuit has likewise remained open to the possibility of a meritorious outrageous government conduct claim. Among the possible conduct recognized as outrageous government misconduct is when the government "engineer[s] or direct[s] the criminal enterprise from start to finish." *United States v. Therrien*, 847 F.3d 9, 15 (1st Cir. 2017) (internal citations and quotations omitted). However, the First Circuit has yet to find a case that meets the demanding standard. *See United States v. Castillo,* 158 F.4th 257, 271 (1st Cir. 2025). *See also Panitz,* 907 F.2d at 1273 (collecting cases).

The conduct challenged here is that the government took money from drug traffickers and brought it to the high seas to exchange for cocaine with other drug traffickers. They then swapped those real drugs for sham drugs and delivered those to the Defendant, who took delivery. This was not a process that from inception to completion involved the government. Rather, the government inserted themselves between extant elements of a drug trafficking network. Contrary to Defendant's argumentation, there is no evidence that this crime he is charged with was planned only by government actors.

The case of *United States v. Panitz* is instructive here. There, the court found that the government completed a smuggling route for marijuana bales and then gave those bales to the defendant. *Panitz*, 907 F.2d at 1273. However, this conduct did not rise to the level of outrageous government conduct. *Id.* In the court's words "[b]y bringing the drugs into the country and acting out the preconceived roles of smuggler's accomplices, the lawmen simply set the stage so that a

marijuana importer and his customers could do what they had planned all along to do." *Id.* This is precisely the conduct at issue in the present case.

Defendant relies heavily on the Third Circuit case *United States v. Twigg* to support his claim of outrageous government misconduct. *United States v. Twigg*, 588 F.2d 373 (3rd Cir. 1978). In *Twigg*, an undercover agent supplied the defendants with the precursory chemical necessary to the manufacture of methamphetamine hydrochloride. *Id.* at 375. However, the agent did not stop there. The agent provided 20% of the glassware necessary for the operation and made arrangements with a chemical supply company to purchase "the balance of the materials". *Id.* at 375-76. They even went as far as renting a farmhouse for the drug production to take place in and providing it to the defendants. *Id.* at 375. The *Twigg* Court found that the government had begun the plan for the manufacture of methamphetamine and supplied both the necessary materials and know-how to complete the crime. *Id.* at 380-81. Especially important to this finding was that the government's assistance was necessary for the crime to occur because "[n]either defendant had the know how with which to actually manufacture methamphetamine". *Id.* at 381.

The evidence presented in the case at bar does not suggest, as in *Twigg*, that the Defendant "was lawfully and peacefully minding his own affairs" prior to the intervention of agents. *Id.* at 381. Taking the allegations in the indictment as true, as is permitted regarding a motion to dismiss, Defendant possessed cocaine. *Ngige*, 780 F.3d at 502. If the government's actions were the only reason Defendant was involved in the drug trade, then he would not have been in possession of actual cocaine. The only thing that agents provided to the Defendant is 50 kilograms of sham cocaine, which he accepted. There is truth to the limited proposition that, but for the actions of agents, the Defendant would not have come into possession of the 50 kilograms of sham cocaine. However, it is not the case that the Defendant would not have been involved in drug trade but for

the government's actions. He was an active participant in the drug trade even without the 50 sham kilograms supplied by the government. Defendant was an "unwary criminal" as opposed to an "unwary innocent" and the government did not commit outrageous misconduct when it interjected with his alleged criminal activities. *Russell*, 411 U.S. at 429. (citing *Sherman v. United States*, 356 U.S. 369, 372 (1958)).[3]

**c. Allegations of Prosecutorial Misconduct**

Defendant next argues that the Assistant U.S. Attorney Camille García Jiménez ("AUSA García") has committed prosecutorial misconduct. In particular, Defendant asserts that the following actions violated the prosecutor's duty. First, AUSA García concealed "that the $500,000 used in this operation was not seized contraband, but money provided by a Puerto Rico DTO [Drug Trafficking Organization] … transported offshore by the FBI, and delivered to the Tortola DTO to induce the movement of 575 kilograms of cocaine." ECF No. 113 at 18. Next, Defendant asserts that AUSA García affirmatively misrepresented that search of a home Defendant owned at DD4 Calle Zafiro at Urbanization Praderas de Navarro ("DD4") was performed after the warrant was obtained, when in fact it was a pre-warrant search. Adding further to the allegations of misconduct, Defendant argues AUSA García directed that agents to amend the warrant return to add items seized from Defendant's Chevrolet Colorado that were not present on the original return. Fourth,

[3] Defendant alleges that agents "transported $500,000 in DTO-supplied criminal proceeds offshore to pay foreign traffickers…" ECF No. 113 at 27. The United States does not contest that this transfer occurred. However, Defendant's only evidence that this is a crime is the absence of clear authorization by FBI supervisors for this transaction. Defendant appears to argue that the absence of discovery evidence demonstrating explicit approval is itself evidence that the law was broken. This is not so. Without a greater showing suggesting that this authorization is not merely absent from the record, but actually did not occur, it is too great an inferential leap to assume that the FBI's activities were criminal. The same analysis applies to Defendant's allegation that FBI agents "coordinated a cocaine-smuggling venture and staged the timing of narcotics movements; discussed using real kilos with tracking devices to operationalize the importation" and "moved large quantities of currency internationally without filing mandatory CMIRs required by 31 U.S.C. § 5316 or complying with anti-structuring duties under § 5324".

the government "withheld operational documents" which "would reveal the FBI's participation in criminal conduct".[4] Each of these alleged instances of misconduct are discussed *seriatim*.

"A request to dismiss an indictment based on government misconduct is an extraordinary remedy and is generally applied to insure proper conduct by government agents. A showing of actual prejudice to the accused is required." *United States v. Rivera Feliciano*, 183 F. Supp. 2d 484, 485 (D.P.R. 2002) (citing *United States v. Rodriguez Malavet*, 738 F.2d 13, 16 (1st Cir. 1984)).

The analysis begins with the claim that AUSA García concealed the details about the offshore drug transaction, such as the source of the $500,000. First, it is not clear that details of the offshore transaction matter to the case at hand. The Defendant is charged, *inter alia*, with conspiracy, attempt and actual possession with intent to distribute cocaine. The details of the offshore transaction are not necessarily relevant to all of these charges, since there are no explicit allegations in the indictment that Defendant participated in the offshore exchange. Assuming *arguendo* that the offshore transaction is relevant, it is still not clear whom this information was withheld from. It was not withheld from the Defendant, who was provided the very information he bases this argument on in discovery from the government detailing the offshore transaction. *See* ECF No. 113-1 at 6-12. A FD-302 form provided in the exhibits to the motion to dismiss notes that an individual "called [redacted] via Signal to arrange for the pickup of $500,000 for the transportation of 575 kilograms of cocaine from Tortola, BVI to Puerto Rico". *Id.* at 6. While the identity of the caller and recipient are not given, this document suggests that the FBI was using

[4] Defendant also argues that that "[t]he FBI then allowed the Tortola DTO [the offshore drug trafficking organization] to keep the full $500,000 without seizure, arrest or interdiction, despite known their identities, vessels, voices, and GPS coordinates." However, this can hardly be considered prosecutorial misconduct, as Defendant admits that the FBI were the ones who met with but did not arrest the offshore traffickers. Additionally, it is not clear how the Defendant's case is prejudiced by the fact that the offshore traffickers were not arrested.

external funds to perform the offshore transaction, not their own. This undercuts Defendant's claim that he was misled as to the source of the $500,000.

The next of Defendant's concerns is that the prosecutor affirmatively misrepresented how the search warrant was executed. He notes that an FBI FD-302 form provided as part of discovery indicates that Defendant's residence at DD4 was searched after the search warrant was obtained. In Defendant's opinion this is not only false, but an affirmative misrepresentation on the part of the prosecutor. However, Defendant's cited material is not material written by AUSA García, but internal FBI records. *See* ECF No. 113 at 18-19. The government has a responsibility to present all relevant discovery evidence to Defendant pursuant to Fed. R. Crim. P. 16. Requiring the prosecutor to assume responsibility for the accuracy of materials she did not create would be in direct tension to this duty. Furthermore, the issue of whether pre-warrant entries into DD4 occurred and what the scope of those entries were was the subject of an evidentiary hearing on Defendant's motion to suppress evidence. ECF No. 114. *See also* ECF Nos. 164, 165, 166. The factual findings of the Report and Recommendation on the motion to suppress are incorporated here. ECF No. 175. There, it was found that only one pre-warrant entry occurred when several law enforcement officers escorted Defendant's wife[5] Melissa Nieves ("Nieves") through the building prior to the execution of the warrant. Nieves testified that she heard a pre-warrant search going on prior to the warrant while she was in DD4. However, her testimony was not credible. ECF No. 175. Instead, the only pre-warrant entry of DD4 by law enforcement was when they escorted Nieves into the home. This, however, was not a pre-warrant search for the reasons explained in the Report and

[5] Nieves in her testimony at the evidentiary hearing on the motion to suppress consistently referred to Cuevas as her husband. However, she noted that they are not legally married and did not live together at the time of the investigation. ECF No. 173 at 11:12-13; *id.* at 12:9-15.

Recommendation as to the motion to suppress. ECF No. 175. Thus, AUSA García did not conceal any pre-warrant search from Defendant.

Next the Defendant contends that AUSA García's direction to add items left off the warrant return back to the return is misconduct. However, the cases Defendant has cited do not stand for the proposition that the failure to effectuate a complete warrant return contemporaneously to the search is prosecutorial misconduct. *See United States v. Chapman*, 524 F. 3d 1073 (9th Cir. 2008), *United States v. Stevens*, 771 F. Supp. 2d 556 (D. Md. 2011). In *Chapman*, the Ninth Circuit affirmed a dismissal for the prosecutor's failure to comply with discovery obligations. *Chapman*, 524 F. 3d at 1077. The case does not specifically consider warrant returns whatsoever. *See id.* Nor are the discovery violations that led to the dismissal in *Chapman* present here. Here, the Defendant was provided with discovery evidence as to the amendment to the return. ECF No. 113-1 at 257. Additionally, the correction to the warrant return occurred on June 23, 2024. The docket reflects that discovery had not begun as of the status conference held on June 28, 2024, five days after the correction. *See* ECF No. 33. In the minutes to the July 28, 2024 status conference, "[t]he government highlighted the voluminous nature of discovery in this case and anticipated an initial package to be provided either next week or the week after." This means that both the corrected warrant return and the document noting the correction predate the beginning of discovery. At no point was Defendant misled about the fact of the correction.

Likewise, Defendant's appeal to *United States v. Stevens* avails him little. In that case, the criminal charges were dismissed because the grand jury was mis-instructed as to the applicable law. *Stevens*, 771 F. Supp. 2d at 566. The prosecutor, in answering a question from a grand juror regarding this defense, incorrectly asserted that it was an affirmative defense when in fact it negates the specific intent needed to commit the charged crime. *Id.* at 564. This misstatement was

problematic because "where a prosecutor's legal instruction to the grand jury seriously misstates the applicable law, the indictment is subject to dismissal if the misstatement casts 'grave doubt that the decision to indict was free from the substantial influence' of the erroneous instruction." *Id.* at 567. Once again, this fact pattern is not well paired with the present case. Defendant has made no challenge to the grand jury proceedings here and even if he had he has not identified any statement that might have improperly influenced the grand jury. Furthermore, even assuming that Defendant had made the case that the failure to initially provide a full warrant return was a violation of any substantive rights, he has still not shown that he was prejudiced by the correction. *See Rivera Feliciano*, 183 F. Supp. 2d at 485.

Finally, the Defendant alleges that the government has "withheld operation documents — undercover approvals, foreign coordination logs, CMIR[6] reports — that could reveal the FBI's participation in criminal conduct…". ECF No. 113 at 19. In essence, the Defendant argues that these are due process violations arising from the failure of the prosecutor to provide sufficient discovery. There have already been substantial discovery disputes in this case which have at times been ruled on by the Court.[7] AUSA Garcia's alleged failure to produce these operational documents has already been adjudicated:

> "Defendant's requests for authorization, internal approvals and oversight of the $500,000 transfer; the communications or coordination with foreign law enforcement; reports or records concerning any arrests, prosecutions, or investigative actions against any co-conspirators; search warrant, photographs or video documentation and/or any inventory or evidence documentation from the seizure of Defendants vehicle are DENIED for the reasons explained by the Government in ECF No. 61."

---

[6] Defendant does not define the term "CMIR report" but context indicates that he refers to the report that must be filed whenever an individual transports more than $10,000 into or out of the United States. *See* 31 U.S.C. § 5316.
[7] Defendant's motions for additional discovery have been both granted and denied at various points. *See* ECF No. 45, 62. At other times the parties were instructed to attempt to work out the discovery issues amongst themselves. *See* ECF Nos. 49, 51. However, at no point has the Court granted requested sanctions against the United States for failure to comply with discovery. *See e.g.* ECF No. 42.

ECF No. 62. Defendant's recasting of a discovery dispute as prosecutorial misconduct is unavailing. In sum, Defendant has failed to show that prosecutorial misconduct indeed has occurred in this case.

**d. Allegations of Selective Prosecution**

Next, Defendant alleges that he has been selectively prosecuted because the offshore traffickers who delivered 575 kilograms of cocaine to the undercover FBI agents have not been prosecuted. Accepting this allegation as true for the purposes of the motion presently before the court, as well as Defendant's assertion that the FBI knew the names and faces of these traffickers, it does not demonstrate that Defendant was impermissibly selected for prosecution.

The caselaw for selective prosecution claims is centered on *United States v. Armstrong*, 517 U.S. 456 (1996). There, the Supreme Court elucidated that "[t]he requirements for a selective-prosecution claim draw on ordinary equal protection standards. The claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* at 517 U.S. at 466 (internal quotations and citations omitted). This is a demanding standard due to the "presumption of regularity" that exists as to prosecutorial decisions. In the absence of "clear evidence to the contrary", this presumption remains in force. *Id.* at 465 (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)). However, a prosecutor's discretion remains "subject to constitutional constraints" including equal protection. *Armstrong*, 517 U.S. at 464. (quoting *United States* v. *Batchelder*, 442 U.S. 114, 125 (1979)). Therefore, "the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Id.* (quoting *Oyler* v. *Boles*, 368 U.S. 448, 456, (1962)).

Fatal to the Defendant is that he has not made any claim that he is a member of an arbitrary classification and those who were not prosecuted were not. "A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *United States v. Lewis*, 517 F.3d 20 (1st Cir. 2008) (citing *Armstrong*, 517 U.S. at 469). Defendant has not alleged that he is a member of the protected class or that the offshore smugglers were not. Furthermore, he has not shown that this decision to prosecute him as opposed to others was "deliberately based" on that protected class.

Defendant, in reply to the government's opposition, asserts that he is not making a "classic equal-protection selective-prosecution claim". ECF No. 129 at 7. However, he does not provide caselaw that suggests that there is a selective prosecution argument to be made when an arbitrary classification is not invoked. Insofar as the Defendant pursues selective prosecution claims not founded in the disparate treatment of an arbitrary classification, that pursuit cannot prosper. The reasoning behind allowing selective prosecution claims under *Armstrong* is because the otherwise broad discretion of a prosecutor is "subject to constitutional constraints." *Armstong* 517 U.S. at 464 (citing *United States* v. *Batchelder*, 442 U.S. 114, 125 (1979)). The review of prosecutorial actions is appropriate when such a constitutional sphere is affected. Defendant instead suggests that the relevant constraint on prosecutorial conduct here is that of fundamental fairness under *United States v. Russell*, 411 U.S. 423 (1973) and *Rochin v. California*, 342 U.S. 165, (1952). By invoking these cases, Defendant seeks to collapse the selective prosecution standard into the outrageous government misconduct standard. As explained above, he does not meet the demanding standard of outrageous government misconduct; looking at it from the lens of selective prosecution helps him no more. There is nothing fundamentally unfair with a prosecutor declining to

immediately prosecute offshore drug traffickers when a local drug trafficker is prosecuted. There are a myriad of benign reasons for this choice, the desire to further investigate the offshore enterprise, or the relative difficulty of bringing offshore traffickers into custody compared to the Defendant who lives in Puerto Rico to name a few. "So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before the grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

**e. Allegations of Fourth Amendment Violations**

The next argument Defendant brings forth is that the government committed multiple violations of the Fourth Amendment in the procurement and execution of the search warrant for DD4. He alleges that there were pre-warrant entries and/or searches into the curtilage and home that were then concealed from the court when agents later sought a search warrant. He also asserts that it was a Fourth Amendment violation for the government to tow the Defendant's Chevrolet Colorado, which was not mentioned in the search warrant for DD4, from the garage of DD4 to FBI headquarters to perform a search of the vehicle. These alleged constitutional violations are also argued with respect to the Defendant's motion to suppress evidence. ECF No. 114. The bulk of his argumentation is better considered in the report and recommendation as to that motion. To that end the argumentation contained in the report and recommendation on Defendant's motion to dismiss is incorporated here. ECF No. 175. However, a few points bear mentioning specifically as to the motion to dismiss.

First, Defendant cites no authority to the effect that a Fourth Amendment violation requires automatic dismissal of the indictment. Instead, he attempts to tie the alleged violations into his greater theory of outrageous government conduct under *Rochin, Russell* and *Twigg*. However,

those cases deal with circumstances in which the government created the crime, they do not speak to Fourth Amendment jurisprudence. The second point to be made is that generally, Fourth Amendment violations result not in dismissal as is the prayer for relief here, but instead in suppression of the illegally obtained evidence. "[A]n indictment should not be dismissed with prejudice when other means exist to correct a constitutional breach." *United States v. Stokes*, 124 F.3d 39, 44 (1st Cir. 1997) (citing *United States v. Morrison*, 449 U.S. 361, 365 (1981)). The report on the motion to suppress, incorporated here, recommends that, despite their being no pre-warrant searches, evidence found as a result of the search of DD4 and the Colorado be suppressed. However, while that may ultimately affect the viability of some of the charges in the indictment, it would be premature to dismiss them outright. If the court were to adopt the findings and recommendation of the report on the motion to suppress, the government should be given an opportunity to inform whether they will pursue prosecution on all pending charges. If the government does not move to voluntarily dismiss any charges because they believe that there is evidence that has not been suppressed that is sufficient to prove beyond a reasonable doubt the alleged offenses the Defendant still has the option to move for a judgment of acquittal at trial under Fed. R. Crim. P. 19 should the evidence be insufficient to sustain a conviction.

### f. Lack of Notice and Double Jeopardy Allegations

The next argument Defendant makes is that the pleading fails to be specific enough to give the Defendant notice of the charges against him. He argues that the indictment "omits the essential core of the alleged offense" and "conceals the government's own role in creating the criminal conduct" by not speaking of the offshore transaction facilitated by federal agents. Because of these failures, Defendant argues that he has been denied appropriate notice of the charges and could be

subject to successive prosecution for the same incident, which in his mind "creates a textbook Double Jeopardy problem." ECF No. 113 at 25.

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The Supreme Court's settled formulation is that an indictment is sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). "[I]t is generally sufficient that an indictment set forth the offense in the words of the statute itself as long as those words set forth all the elements of the offense without any uncertainty or ambiguity." *United States v. Brown*, 295 F.3d 152, 154 (1st Cir. 2002) (internal quotation marks and citation omitted). "Notably, the indictment need not provide a preview of the evidence to be adduced at trial." *United States v. Alicea-Currás*, 768 F. Supp. 3d 301, 304 (D.P.R. 2025) (citing *United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018)).

Defendant's principal reliance on *United States v. Cecil*, 608 F.2d 1294 (9th Cir. 1979), does not carry the weight he places on it. *Cecil* held defective an indictment the Ninth Circuit described as "a rather barren document." *Id*. at 1297. The indictment there did little more than track the statutory language, identify some co-conspirators, state that the conspiracies occurred in Arizona, Mexico, and elsewhere, and allege that they began "on or *before* July, 1975" and continued "until on or *after* October, 1975." *Id*. at 1296–97 (emphasis added). The defect in *Cecil* was not merely the breadth of the dates. Rather, the court emphasized that "[t]he indictment fails to state any other facts or circumstances pertaining to the conspiracy or any overt acts done in

furtherance thereof" and, more importantly, that it failed to place the conspiracies within any meaningful time frame because the dates were "open-ended in both directions." *Id.* at 1297.

Courts within the First Circuit have recognized that *Cecil* both overreads *Hamling* and does not reflect First Circuit law. In *United States v. Cloutier*, the court observed that, "[i]f the law as stated in the *Cecil* case were applied," the indictment before it would be dismissed, but concluded that *Cecil* should not be followed because it overstated *Hamling* and imposed requirements not adopted in this Circuit. *United States v. Cloutier*, 1990 U.S. Dist. LEXIS 13143, at 16–18 (D. Mass. July 31, 1990).

Likewise, in *United States v. González*, the First Circuit held that reliance on *Cecil* was "misplaced" because the indictment there was deficient not merely due to its temporal breadth, but because it was so factually lacking "as to deprive the defendants of adequate notice of the charges against them." *United States v. González*, 1990 U.S. App. LEXIS 16964, at 17–18 (1st Cir. Sept. 11, 1990) (per curiam) (unpublished table decision).

Here, the indictment tracks the statutory language closely. It is admittedly not a narrative, only providing dates, the fact the charged conduct took place at least partially within the district of Puerto Rico and, with respect to count four, an address. However, each charge does include the elements of the offense. This is sufficient to apprise both apprise defendant of the charges and protect against double jeopardy in future prosecutions. *See Hamling*, 418 U.S. at 117. Furthermore, the indictment is not "open-ended in both directions" with respect to time as it was in *Cecil.* 608 F.2d at 1297. Some counts have specific dates (e.g., counts 2, 3, 5, 6), while others like count 1 allege that the criminal activity began "on a date unknown, but no later than on or about May 15, 2024, until the return of this Indictment [May 22, 2024]." ECF No. 17 at 1. Defendant's desire to

know what and how much information regarding the offshore transaction the government will bring at trial, if any, is not a basis to deem an indictment as defective on lack of notice grounds.[8]

Even if the indictment did lack specificity, that is still not sufficient to cause the double jeopardy issue that Plaintiff claims. Double jeopardy claims are not ripe until jeopardy has attached. Jeopardy does not attach "until a defendant is put to trial before the trier of the facts," and in a jury trial that occurs when the jury is empaneled and sworn; in a bench trial it occurs when the court begins to hear evidence. *Serfass v. United States*, 420 U.S. 377, 388 (1975). *See also United States v. Jorn*, 400 U.S. 470, 479 (1971). Therefore, without jeopardy having attached even once, Defendant's concern about double jeopardy is unripe.[9]

In the alternative to dismissal, Defendant requests a bill of particulars seeking "…whether the Government's theory includes or excludes: (1) the maritime-importation episode, (2) the $500,000 DTO-funded transaction, (3) money-laundering and currency offenses, and (4) the sham-delivery narrative that forms the basis of the affidavit." ECF No. 113 at 26. This request too should be denied. As the prosecution notes "[m]otions for bills of particular are seldom employed in modern federal practice." *United States v. Ellison*, 442 F. Supp. 3d 491, 496 (D.P.R. 2020) citing

[8] Defendant asserts without citation to caselaw or statute that count one of the indictment, conspiracy to possess with intent to distribute a controlled substance under, *inter alia,* 21 U.S.C § 846 cannot be supported by the sham cocaine delivery, therefore the offshore transaction must be discussed at trial. ECF No. 113 at 25. Assuming that the underlying legal proposition is true, it still represents a prosecutorial choice as to which evidence they will use to demonstrate conspiracy. Defendant's notice of this evidence's potential use comes properly from discovery, not the indictment. *See* Fed. R. Crim. P. 16(a)(1)(E)(ii) (requiring upon Defendant' request the disclosure of any evidence the prosecution intends to use in its case in chief at trial). Defendant's reasoning is analogous to arguing that an indictment charging larceny is insufficient because it does not mention how the government will seek to prove scienter. To be sure, scienter is, in Defendant's words an "essential factual core of the alleged offense", but Fed. R. Crim. P. 7(c)(1)'s requirement is only that the element is pled in the indictment. ECF No. 113 at 24.

[9] Even if the Court were to reach the merits, the double-jeopardy theory remains overstated. The core same-offense test is found *Blockburger v. United States*: whether each offense requires proof of a fact the other does not. *Blockburger v. United States*, 284 U.S. 299, 304 (1932). And *United States v. Felix*, 503 U.S. 378 (1992), directly undercuts Defendant's broader same-episode framing. There, the Court stated that "mere overlap in proof between two prosecutions does not establish a double jeopardy violation," and it reaffirmed that a conspiracy and the substantive offense that is its object are not the same offense for double-jeopardy purposes. Id. at 386, 390–91. Thus, overlap between the maritime evidence and the domestic conspiracy proof does not itself establish that any future charge would necessarily be barred.

*United States v. Sepulveda*, 15 F.3d 1161, 1192 (1st Cir. 1993), cert. denied, 512 U.S. 1223 (1994). "When pursued, they need be granted only if the accused, in the absence of a more detailed specification, will be disabled from preparing a defense, caught by unfair surprise at trial, or hampered in seeking the shelter of the double jeopardy clause." *Id.* (citing *United States v. Abreu*, 952 F.2d 1458, 1469 (1st Cir. 1992)). And trial courts retain broad discretion when ruling upon requests for such bills. *Will v. United States*, 389 U.S. 90, 98-99 (1967); *United States v. Abreu*, 952 F.2d at 1469. "When an indictment is sufficiently specific there is no need to grant a bill of particulars." *United States v. Vazquez-Rijos*, 250 F.R.D. 99, 100 (D.P.R. 2008)

Defendant also argues that without a bill of particulars he will be subject to double jeopardy. However, as discussed above, the indictment is sufficiently specific to place the defendant on notice of the charges against him. "[C]ourts 'deny a request for a bill if the information sought would simply be helpful to the defense rather than strictly necessary to a fair trial.'" *United States v. Ellison*, 442 F. Supp. 3d at 496 (quoting Wright & Leipold, § 130, at 662-63). "More broadly, no bill is required if the government has provided the desired information through pretrial discovery or in some other satisfactory manner." Wright & Leipold, § 130, at 663-64. Here, the Defendant has been made aware of the transaction at sea, which included the transfer of $500,000, and the controlled delivery of sham cocaine to Defendant through pretrial discovery. *See e.g.* ECF No. 113-1 at 1-7. Hence, there is no need to require a bill of particulars.[10]

Furthermore, the same lack of ripeness concern continues to apply to his double jeopardy claim. Defendant has not been charged with "money-laundering and currency offenses" that he claims may be part of the government's case. ECF No. 113 at 26. His concern that he may one day be is a speculative exercise. Without an actual charge, these potential charges cannot possibly

[10] Nothing prevents the Defendant from seeking a designation of evidence. *See* Fed. R. Crim. P 12(b)(4)(B).

violate the double jeopardy clause.[11] For these reasons, his request for a bill of particulars should be denied.

## IV. CONCLUSION

For the foregoing reasons it is recommended that Defendant's motion to dismiss be DENIED. However, if the Court, in its sound discretion, adopts the report and recommendation on the motion to suppress (ECF No. 175), it is recommended that the government be given time to evaluate the continuing viability of each one of the charges in the indictment and inform whether it will continue prosecuting them or instead move to dismiss any of them. It is further recommended that Defendant's request for an evidentiary hearing and a bill of particulars be likewise DENIED.

The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); *see also* 28 U.S.C. § 636(b)(1); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 11th day of September 2026.

s/Marcos E. López
U.S. Magistrate Judge

[11] It is not implied that charging the Defendant would or would not violate the Double Jeopardy clause, only that, until such time as he is charged with additional crimes relating to the same conduct as the present charges, a double jeopardy analysis is unnecessary.