IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

YAMIL CUEVAS-HERNANDEZ

Defendant.

CRIMINAL NO. 24-190 (CVR)

**OPINION AND ORDER**

**INTRODUCTION**

On December 1, 2025, Defendant Yamil Cuevas-Hernández ("Defendant") filed "Defendant's Motion to Suppress Evidence Seized from the Residence and Chevrolet Colorado and Memorandum of Law in Support thereof" ("Motion to Suppress") with an exhibit in support thereof containing 258 pages. Defendant claims there were pre-warrant entries into his home at DD4 Calle Zafiro at Urbanization Praderas de Navarro in Gurabo Puerto Rico ("DD4") which were omitted from the affidavit in support of the warrant application to search DD4. Defendant also argues the search of the Chevrolet Colorado (the "Colorado"), which was in DD4's garage, was outside the scope of the search warrant. Id. Three search warrants were granted with respect to Defendant's investigation, to wit, one for DD4 and one for each of two vehicles associated with Defendant. However, Defendant only seeks suppression of the evidence seized pursuant to the search warrant of DD4 and the Colorado. (ECF Nos. 114 and 114-1).

On February 9, 2026, the government responded claiming Defendant failed to demonstrate any falsehood (intentional or otherwise) in the FBI agent's affidavit, there

was no warrantless entry to Defendant's residence, the search of the Colorado was valid, the good faith exception applies and requested the motion under Franks v. Delaware, 438 U.S. 154 (1978) be denied without a hearing for failing to provide a sufficient offer of proof. (ECF No. 127). Defendant replied on February 23, 2026. (ECF No. 130).

On February 24, 2026, the Motion to Suppress Evidence (ECF No. 114) and the Motion to Dismiss the Indictment (ECF No. 113) were referred to a Magistrate Judge for a hearing, if necessary, and Report and Recommendation. (ECF No. 133). The referral was randomly assigned to Magistrate Judge Marcos E. López ("Magistrate Judge López"). (ECF No. 134).

On August 17-19, 2026, an evidentiary hearing was held before Magistrate Judge López. (ECF Nos. 164, 165, 166, 171, 172, 173, and 174). Multiple exhibits were admitted into evidence. (ECF Nos. 178, 181 and 183).

On September 11, 2026, Magistrate Judge López issued a Report and Recommendation ("R&R") granting in part and denying in part Defendant's Motion to Suppress. (ECF No. 175).[1]

On September 25, 2026, Defendant filed a motion for extension to time to file his objections to the R&R which the Court granted. (ECF Nos. 184 and 186).

On September 25, 2026, the government timely filed its "Objection to the Report and Recommendation as to Defendant's Motion to Suppress at ECF No. 175." (ECF No. 185). The government claims Magistrate Judge López erred in finding the affidavit in

1 A separate R&R was issued as to the Motion to Dismiss the Indictment which is the object of a separate Opinion and Order. (ECF No. 176).

support of the search warrant conducted in this case of DD4 failed to establish probable cause to search and the alleged omitted information from the affidavit concerning the recovery of the sham cocaine was reckless and material under Franks, 438 U.S. at 154. The government also objects the finding that the "good faith exception" to the warrantless search recognized in United States v. León, 468 U.S. 897 (1984) does not apply due to the alleged conduct omitted information in the affidavit, which rendered it invalid. In sum, the government contends there was probable cause to issue the search warrant for DD4 and the alleged omissions were non-essential to the probable cause finding by the issuing Magistrate Judge. Therefore, the government asserts the validity of the search warrant should be upheld and the evidence admissible. Id.

On October 8, 2026, at 10:54 PM, the day before Defendant's objections to the R&R were due pursuant to the extension of time, defense counsel Rafael Castro-Lang ("counsel Castro-Lang") filed a motion requesting withdrawal from the legal representation of Defendant due to an alleged conflict with paralegal Víctor Vega-Encarnación who has assisted him in this case. Counsel Castro-Lang indicated he has multiple health issues, including a disability due to a hip fracture, he retired from the legal profession and is living with his wife in South Carolina and does not have a return ticket. In addition, counsel Castro-Lang indicated the following: "[t]he Court has granted Defendant until October 9, 2026 (Docket Nos. 184-185), to file his objections to the Magistrate Judge's Report and Recommendation in this case. Although Vega[-Encarnación] prepared a draft motion, which counsel rejected, counsel will be unable to comply with that deadline."

(ECF No. 187, p. 2).

On October 9, 2026, at 8:44 AM, the Court denied without prejudice counsel Castro-Lang's motion to withdraw as legal counsel until new defense counsel appears on Defendant's behalf. The Court explained the reasons for the denial and indicated the objections to the R&R were due on that day pursuant to the 14-day extension of time which had been granted in ECF No. 186. (ECF No. 188).

On October 9, 2026, at 11:07 AM, Defendant filed a "Response in Opposition to the United States' Objection to the Report and Recommendation (ECF No. 185)." (ECF No. 190).[2]

On October 9, 2026, at 2:52 PM, Defendant filed his objections to several portions of the R&R including, among others, the findings related to the arrest of "Josué García-Sánchez", the seizure of the Colorado, and that no pre-warrant entry into DD4 and search occurred. (ECF No. 192).

On October 13, 2026, the government filed a Motion to Strike ECF Nos. 189, 190 and 192 explaining the reasons why it was moving the Court to (1) strike Defendant's filings at ECF Nos. 189, 190 and 192, (2) enter a show cause for defense counsel Castro-Lang as to why he should not be sanctioned for filing a motion that he himself said was drafted by Vega-Encarnación and that he had rejected, and (3) enter an order prohibiting Vega-Encarnación from performing functions reserved exclusively to licensed attorneys

2 No rule, federal or local, requires a party to respond to the objections to an R&R raised by an opposing party. Considering that Defendant filed his Objections to the R&R separately at ECF No. 192, his Response to the government's objections to the R&R (ECF No. 190) is deemed unnecessary and was not considered.

in any further proceeding before this Court. (ECF No. 194).

On the same day, the Court issued an order holding in abeyance ECF No. 194 and ordering counsel Castro-Lang to show cause as follows: "Defendant Cuevas-Hernandez, through counsel Castro-Lang, shall show cause by 10/16/2026 as to why the Motion to Strike shall not be granted. Counsel Castro-Lang shall inform the Court how he complied with the Local Rules and the ABA Model Rules of Professional Conduct mentioned in the Motion to Strike and certify its compliance." (ECF No. 195).

On October 16, 2026, counsel Castro-Lang filed his Response to the order to show cause at ECF No. 195 and opposed the government's Motion to Strike. (ECF No. 197). Today, the Court denied the Motion to Strike (ECF No. 194) and deemed the order to show cause complied with. (ECF No. 198).

For the reasons explained below, the R&R is ADOPTED IN PART AND REJECTED IN PART. (ECF No. 175).

## STANDARD OF REVIEW

The Court may refer dispositive motions to a Magistrate Judge for an R&R. See 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Within fourteen days of receiving a copy of the R&R, "a party may serve and file specific written objections to the proposed findings and recommendations." Id. Upon filing of a timely objection, a party is entitled to a de novo determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." Total Petroleum Puerto Rico Corp. v. Fonseca-Marrero, 2018 WL 6131777, at *1 (D.P.R. 2018) (quotation omitted); see

also Ponsa-Rabell v. Santander Securities, LLC, 2020 WL 4219685, at *1 (D.P.R. 2020). Thus, the Court reviews de novo portions of an R&R to which a party objects. See 28 U.S.C. § 636(b)(1)(C); see also, United States v. J.C.D., 861 F.3d 1, 6 (1st Cir. 2017). When performing this review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(a)(b)(1). Objections must "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for the objection." Local Rule 72(d); see also, Fed. R. Civ. P. 72(b)(2). However, the Court need not "consider frivolous, conclusive, or general objections." See Rodríguez-González v. Astrue, 854 F.Supp.2d 176, 178 (D.P.R. 2012). And if objections merely repeat arguments already made to the magistrate judge, a de novo review is unwarranted, and the district judge will review those portions of the R&R for clear error. Id. Further, a party objecting to an R&R is not "entitled as of right to a de novo review by the [district] judge of an argument never raised" before the magistrate judge. See United States v. Rosado-Cancel, 917 F.3d 66, 69 (1st Cir. 2019).

The First Circuit stated in Santos-Santos v. Torres-Centeno that when no objection to a report and recommendation has been presented, a district court may assume that "[the affected party] agree[s] with the magistrate judge's recommendation." 842 F.3d 163, 166 (1st Cir. 2016) (quoting Santos-Santos v. P. R. Police Dep't., 63 F.Supp.3d 181, 184 (D.P.R. 2014)). Thus, the district court only needs to determine "that there is no 'plain error' on the face of the record" for unopposed portions of a report and recommendation.

Vázquez-García v. Hacienda Madrigal, Inc., 2019 WL 4739324, at *1 (D.P.R. 2019) (citing López-Mulero v. Vélez-Colón, 490 F.Supp.2d 214, 218 (D.P.R. 2007)).

Thus, the Court conducts a de novo review of the portions of the R&R which were objected by the parties while using the aforementioned clear error standard for the portions Defendant objects which merely repeat arguments already made to the Magistrate Judge.

## APPLICABLE LAW

### I. Franks Hearing.

A criminal defendant does not have a presumptive right to an evidentiary hearing on a motion to suppress. United States v. D'Andrea, 648 F.3d 1 (1st Cir. 2011); United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010) (citing United States v. Panitz, 907 F.2d 1267, 1273 (1st Cir. 1990)). "A hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record.... Most importantly, the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." D'Andrea, 648 F.3d at 1; United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996).

"[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing

be held at the defendant's request." Franks, 438 U.S. at 154. A material omission of information may also trigger a Franks hearing. See United States v. Hadfield, 918 F.2d 987, 992 (1st Cir. 1990); United States v. Rivera-Rosario, 300 F.3d 1, 20 (1st Cir. 2002). Therefore, one must consider whether a defendant has made "a substantial preliminary showing" that the omissions he identifies were "made knowingly and intentionally" or "with reckless disregard for the truth" and whether the omissions were "necessary to the finding of probable cause." Franks, 438 U.S. at 155-56.

Courts have noted an important difference between the "necessary" inquiries when the challenge is to the omission of an allegedly material fact rather than to the inclusion of an allegedly false material statement. With an omission, the inquiry is whether its inclusion in an affidavit would have led to a negative finding by a magistrate judge on probable cause. If a false statement is in the affidavit, the inquiry is whether its inclusion was necessary for a positive finding by the magistrate judge on probable cause. United States v. López Pantojas, Crim. No. 07-175 (ADC), 2007 WL 4723502, at *5 (D.P.R. 2007), report and recommendation adopted sub nom, United States v. López Pantojas, Crim. No. 07-175 (ADC), 2008 WL 336299 (D.P.R. 2008).

"[T]o mandate an evidentiary hearing the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Franks, 438 U.S. at 154; see also, United States v. Grant, 218 F.3d 72 (1st Cir. 2000).

"There is, of course, a presumption of validity with respect to the affidavit supporting [a] search warrant." Franks, 438 U.S. at 171. To obtain an evidentiary hearing, a challenger must accompany allegations of deliberate falsehood or of reckless disregard for the truth with an offer of proof. Id.; United States v. Centeno-González, 989 F.3d 36, 50 (1st Cir. 2021) (same). "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." Id. A comparable showing is required if the defendant would establish that technically accurate statements by an affiant have been rendered misleading by material omissions. See United States v. Rumney, 867 F.2d 714, 720 (1st Cir. 1989); United States v. Scalia, 993 F.2d 984, 987 (1st Cir. 1993) (same); United States v. Gómez-Encarnación, 2015 WL 2354570, at *3 (D.P.R. 2015) (holding that Franks hearing was unwarranted as Defendant failed to submit an offer of proof specifying alleged material omissions in the affidavit attached to a search warrant); United States v. Figueroa-Rivera, No. CR 17-569 (RAM), 2020 WL 777504, at *3 (D.P.R. 2020) (same). "Mere inaccuracies, even negligent ones, are not enough." United States v. Adams, 305 F.3d 30, 36 n. 1. (1st Cir. 2002); United States v. De Castro Font, 593 F. Supp. 2d 393, 397 (D.P.R. 2009).

Turning to this case, Defendant requested a Franks hearing, and the government argued he was not entitled to said hearing because he failed to meet the criteria under Franks. Applying the above standard, the Court infers that Magistrate Judge López found Defendant met the first step under Franks as he held an evidentiary hearing on Defendant's Motion to Suppress. The Court finds no error in said determination. Step two

of the Franks' inquiry is discussed below.[3]

### II. Probable Cause.

The Fourth Amendment generally forbids the issuance of any warrant without a showing of probable cause. U.S. Const. amend. IV. To satisfy the probable cause standard, "a search-warrant application must reveal probable cause to believe two things: one, that a crime has occurred - a.k.a., the "commission" element; and two, that specified evidence of the crime will be at the search location - a.k.a., the "nexus" element." United States v. Joubert, 778 F.3d 247, 251 (1st Cir. 2015); United States v. Dixon, 787 F.3d 55, 59 (1st Cir. 2015) (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)); United States v. González, 113 F.4th 140, 148 (1st Cir. 2024) (same). The nexus requirement "can be inferred from the type of crime, the nature of the items sought, ... and normal inferences as to where a criminal would hide [evidence of a crime]." United States v. Corleto, 56 F.4th 169, 175 (1st Cir. 2022) (internal quotation marks omitted and alterations in original).

"[P]robable cause need not be tantamount to proof beyond a reasonable doubt.... Probability is the touchstone." United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997) (quoting United States v. Aguirre, 839 F.2d 854, 857 (1st Cir. 1988)). The probable cause standard does not require any showing that an officer's belief that evidence will be found in the searched premises "be correct or more likely true than false." Texas v. Brown, 460 U.S. 730, 742 (1983). Probable cause to search a home existed so long as the affidavit contained information showing a "fair probability" that evidence of a crime would be

3 The Court adopts and incorporates herein by reference the "Factual Background" included in the R&R at pages 2-6 for its accuracy. (ECF No. 175).

found there. Illinois v. Gates, 462 U.S. 213, 238 (1983); see Khounsavanh, 113 F.3d at 283; United States v. Procopio, 88 F.3d 21, 25 (1st Cir. 1996); Grant, 218 F.3d at 74.

With respect to the "nexus" element, a judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." Feliz, 182 F.3d at 86 (alteration in original) (quoting Gates, 462 U.S. at 238). "The criterion ... is whether the facts presented in the affidavit would 'warrant a man of reasonable caution' to believe that evidence of crime will be found." Id., at 87 (quoting Texas v. Brown, 460 U.S. at 730).

With respect to a suspected drug dealer's residence, "[t]he inquiry is not whether 'the owner of the property is suspected of crime' but rather whether 'there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought.'" United States v. Román, 942 F.3d 43, 51 (1st Cir. 2019) (quoting Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978)). "A nexus ... need not, and often will not, rest on direct observation, but rather can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]." Id. (alterations in original) (internal quotation marks omitted) (quoting Feliz, 182 F.3d at 88). To permit such an inference of a nexus to a defendant's residence, the court looks to whether "generalized observations" that "drug dealers tend to store evidence in their homes" are combined with "specific observations, or facts, connecting the drug dealing to the home,"

such as "evidence that drug distribution was being organized from [the defendant's] residence, that the defendant used his home as a communications hub for drug activity, or that the defendant move[d] back and forth from his residence in relation to the drug transactions." Id. at 51-52 (alterations in original) (citations omitted) (internal quotations omitted).

When reviewing the sufficiency of an affidavit relied upon by a magistrate judge, the First Circuit exercises "an ample amount of deference to the issuing magistrate's finding of probable cause." Dixon, 787 F.3d at 58. Therefore, reversing the magistrate judge's initial determination is only appropriate if there is "no substantial basis for concluding that probable cause existed." Id. at 58-59. A prior judicial determination of probable cause is entitled to great deference by the reviewing court. In considering the sufficiency of an affidavit, a court must determine whether the "totality of the circumstances" presented demonstrate probable cause. United States v. Strother, 318 F.3d 64, 67 (1st Cir. 2003).

**DEFENDANT'S OBJECTIONS TO THE R&R**

After conducting a de novo review of those portions of the R&R which Defendant objects, the basis for the objections and the totality of the record, the Court finds that Defendant's objections to the R&R show he does not provide sufficient grounds justifying a change in the Magistrate Judge's findings and legal conclusions for the objected portions. In addition, as to Defendant's objections to the R&R, which merely repeat arguments already made to the Magistrate Judge, no error was found.

Therefore, the Court hereby ADOPTS all the portions of the R&R that Defendant objects.

**GOVERNMENT'S OBJECTIONS TO THE R&R**

The government's objections to the R&R are limited to the following: the alleged lack of nexus between Defendant's drug trafficking activities and DD4, the alleged lack of probable cause in the affidavit in support of the search warrant of DD4, the alleged omission of information in the affidavit concerning the recovery of the sham cocaine was reckless under Franks, and the non-application of the good faith exception recognized by León, 468 U.S. at 897.

After conducting a thorough de novo review of the portions of the R&R the government objects and the basis for its objections, the Court agrees with the government and finds there was probable cause for the issuing Magistrate Judge to issue the search warrant for DD4 essentially based on the arguments raised by the government in its Objections.[4] The Court further explains.

The Court agrees that Magistrate Judge López interpreted the affidavit in support of the search warrant of DD4 too narrowly. A review of the portion of the R&R, on which it bases the recommendation that suppression is warranted for a lack of nexus between Defendant's drug trafficking activities and DD4[5], shows that, given all the circumstances set forth in the affidavit before the issuing Magistrate Judge, the affidavit presented

4 The Court clarifies that, to be in the same position as the issuing Magistrate Judge, the finding of probable cause is based on a de novo review of the four corners of the search warrant, its affidavit and Attachments. (ECF No. 175-1).
5 ECF No. 175, pp. 22-23.

demonstrated probable cause to issue the search warrant for DD4. Strother, 318 F.3d at 67.

First, the analysis of the R&R seems to be based solely on the non-boilerplate parts of the affidavit in support of the search warrant for DD4 and not on all the information set forth in the affidavit. The R&R's highlights start as follows: "[h]ere, the non-boilerplate portion of the affidavit in support of the DD4 search warrant application is, to put it mildly, succinct." (ECF No. 175, p. 22). Then, it summarizes some non-boilerplate portions of the affidavit that were deemed important and concludes by stating "[t]he remainder of the affidavit is boilerplate language." (Id.). This assertion demonstrates that Magistrate Judge López dismissed the boilerplate statements and only focused on the non-boilerplate language of the affidavit. The four corners of the affidavit in support of the application of the search warrant for DD4 included an application for the search warrant, an affidavit in support thereof of 18 pages, Attachments A-1, A-2 and A-3 which described the properties to be searched, and Attachment B which itemized the specific things to be seized. (ECF No. 175-1). Importantly, the boilerplate language in this case which was not mentioned in the R&R included the background, experience, investigations and training of the FBI Special Agent who swore the affidavit in support of the search warrant. In particular, the affiant stated the following: "[b]ased on my training and specific to the present investigation, I am aware that drug traffickers maintain residences and properties to facilitate their illegal business. I know that narcotics trafficker will often keep scales, ledgers, large and small denominations [of] cash, money counters, electronic

devices, ammunition, weapons, narcotics, and other fruits of the crime in their residence or in other properties associated with the DTO." (Id., p. 5).[6] Thus, the affiant made several "generalized observations" based on her training and experience, such as the commonality of individuals involved in illegal drug trafficking to: possess, maintain, and keep at their residence records, journals, or notes pertaining to drug trafficking; possess, maintain, and keep at their residence drug paraphernalia; and possess, maintain, and keep with or near them, including at their residence, sums of money, among others. To conduct the analysis of the affidavit overlooking the boilerplate language is unpersuasive. "Sometimes formulations become boilerplate because they are so often true and relevant. It would be perverse for a court, bound to undertake analysis of 'fair probability' ... to ignore such statements because of their broad applicability." United States v. Ribeiro, 397 F.3d 43, 51 (1st Cir. 2005)[7] (citation omitted).

Even though the R&R does not mention that the boiler plate information was considered by the Magistrate Judge in reaching his conclusion, the Court infers the

6 As a matter of fact, as properly asserted by the government, the discovery of sixteen kilograms of cocaine, fourteen firearms, $994,000.00 in the Colorado in DD4's attached garage, the clothes used during the criminal offense, ledgers and cellphones illustrate the practical accuracy of the affiant's experience as described in the boilerplate portion of the affidavit. (ECF No. 185, p. 12).

7 The R&R distinguishes Ribeiro, 397 F.3d 43 because said case involved four controlled purchases and evidence that defendant left a particular address before traveling to three of those transactions, whereas this case involved a single controlled transaction. The Court agrees with the government that, although the repeated pre-transaction movements in Ribeiro provided a different factual connection than the one present in this case, Ribeiro does not establish the number of controlled buys necessary to establish nexus. The inquiry remains whether the particular facts, viewed together, established a fair probability that the items sought in Attachment B could be found at DD4. In Ribeiro, the First Circuit recognized that evidence that a defendant "move[d] back and forth from his residence in relation to drug transactions" can support probable cause to search the residence which is what happened in the instant case. Id., at 51. The significance of the movements (which in this case were three in which Defendant twice and his wife once went in and out of DD4 after the commission of the offense) lies in what they show about the relationship between the residence and the criminal activity, under the totality of circumstances, not just the number of controlled buys. As a matter of fact, the general holdings of Ribeiro apply to this case as quoted several times in this Opinion and Order.

issuing Magistrate Judge did consider this information as the affiant's experience and training should be given some weight to the determination that the residence probably contained relevant evidence. Ribeiro, 397 F.3d at 50-51 ("[D]rug traffickers frequently use their homes for storing cash and records relating to their illicit activity."); United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979) (same). In any case, even assuming Defendant kept the drugs elsewhere, there may well have been other evidence of Defendant's alleged large-scale drug conspiracy in his home. See Ribeiro, 397 F.3d at 49 ("One can reasonably infer that ... large-scale traffickers would need to keep detailed accounts, customer lists, and money in some safe yet accessible place, i.e., their homes.") (citation and internal quotation marks omitted).

Second, Attachment B of the affidavit, which the R&R fails to mention but the Court reasonably infers was considered by the issuing Magistrate Judge, clearly established the particular items to be seized which included books, records, receipts, notes, ledgers, deeds, cash, currency, items of value derived from trafficking in controlled substances including but not limited to jewelry, gold, silver, precious gems, bank records, photographs, videos, firearms, clothes used during the commission of the crime, computers or storage media including mobile phones and tablets, among others. (ECF No. 175-1, pp. 24-29). This kind of warrant (without characterization) for other items and not drugs is recognized in the case law.[8] Thus, to limit the analysis in the R&R only to the

8 See, e.g., Feliz, 182 F.3d at 88; United States v. Thomas, 989 F.2d 1252, 1254 (D.C.Cir. 1993) (warrant authorized police to search for "books, ledgers, records and other documents," as well as the clothing worn by the defendant during sale to undercover officer earlier that day); United States v. Williams, 974 F.2d 480, 481-82 (4th Cir. 1992) (per curiam) (affidavit establishing that known drug dealer currently resided in a motel room was sufficient to support warrant for

lack of nexus between the sham cocaine to DD4 is erroneous because the nexus between DD4 and Defendant's drug trafficking activities was not limited to drugs being found in DD4 but also included multiple other items.

Third, the most important statements included in the highlights of the non-boilerplate language of the affidavit and the marginal comments made by the Magistrate Judge in the R&R need to be addressed individually as they do not support the conclusion that there was no nexus between Defendant's drug trafficking activities and DD4. (ECF No. 175, pp. 22-23).

a. *"'The Communications with co-conspirators were conducted using cell phones.' Id. The affidavit does not make it clear if Defendant used a cell phone to communicate with co-conspirators, or if it was the undercover agents using cell phones to communicate with Defendant's co-conspirators."* (Id., p. 22). From the information included in the affidavit that the communications with co-conspirators were conducted using cell phones, the issuing Magistrate Judge could reasonably infer that, among the co-conspirators was Defendant to whom the undercover agents had delivered 50 kilograms of sham cocaine earlier and that he thus communicated using cell phones with other co-conspirators to facilitate the commission of the drug offense.[9]

records, documents, money, and paraphernalia used in the sale and distribution of narcotics); United States v. González, 940 F.2d 1413, 1419-20 (11th Cir. 1991) (warrant for "documents and United States currency related to the illegal importation and distribution of controlled substances"). "Although none of these cases use the term 'documentary search warrant' or refer to it as a concept, their discussion of warrants comparable to the one here belies any claim that the warrant reflects a new phenomenon." Ribeiro, 397 F.3d at 51-52.

9 This inference can also be made from the fact that, after receiving the sham cocaine and Defendant's flight from the officers, the affidavit stated that CCTV footage showed Defendant exiting Vehicle 1 and boarding Vehicle 2 which was

b. *"Defendant then went **straight** to DD4 at the Urbanization Praderas de Navarro. Id. at 4-5 ¶14. The reader is not told where he parked, whether on the street, in the curtilage or in the garage."* (emphasis ours) (Id., p. 22). The importance of this portion is that Defendant went **straight** to DD4 and entered the residence, after being delivered 50 kilograms of sham cocaine. Where he parked at DD4 is of little importance as to the probable cause inquiry when the totality of circumstances set forth in the affidavit is considered.

c. *"He enters DD4, exiting about 10 minutes later. Id. at 5 ¶14-15. The affidavit does not say that anything illegal – or even a bag – was on his person when he entered or exited DD4. He gets back in the F-150 and drives away. Id."* (Id., p. 22). The comment that the affidavit does not say that Defendant had anything illegal on his person or even a bag when he entered DD4 does not necessarily militate against probable cause to search DD4 as implied in the R&R. This is because the issuing Magistrate Judge, based on the totality of circumstances set forth in the affidavit including the proximity between Defendant's receipt of the sham cocaine and his entering DD4 (10 minutes later), could make a practical common-sense decision that, even though no items were visible, there was a nexus with DD4. For example, it could be reasonably inferred by the issuing Magistrate Judge that Defendant was concealing evidence of the crime in DD4 or that he could be concealing an item

driven by Defendant's wife. (Case No. 24-487M, ECF No. 3-1, p. 5, paragraph 18). From this information, it could reasonably be inferred Defendant communicated with his wife by cell phone.

in his person (i.e. under his shirt or in a pocket) related to the drug trafficking activities that was not visible to the agents conducting the surveillance such as a cellphone, firearm, ammunition, cash, among others. In addition, the search warrant was seeking different categories of materials none of which were drugs. Then again, the focus of the R&R relies exclusively on the sham cocaine and the duffle bags which seem to be too limited considering the other items related to the drug trafficking offense which were sought in the search warrant for DD4.

d. *"He gets back in the F-150 and drives away. Id. While driving he* ***evaded*** *the police stop and police lost sight of him. Id. at ¶16."* (emphasis ours). (Id., p. 22). This portion of the R&R's highlights differs somewhat from the content of paragraph 16 of the affidavit and omits some important details. The affidavit states the following as to this part: "Officers in a **marked POPR vehicle attempted to stop CUEVAS** for a traffic violation. CUEVAS failed to comply and **fled** in VEHICLE 1, **leading to a vehicle pursuit** …" (emphasis ours) (ECF No. 175-1, p. 7). Thus, the affidavit specifically indicated the law enforcement agents were in a marked POPR vehicle, attempted to stop Defendant for a traffic violation after he left DD4 in Vehicle 1 (which is the F-150 vehicle in which Defendant was in when the sham cocaine was delivered to him), he failed to stop and comply with the officer's commands, fled and a vehicle pursuit ensued. These details, omitted in the R&R's highlights of the non-boiler plate language of the affidavit, are important because they show the

issuing Magistrate Judge knew when he found probable cause for the search warrant of DD4 that, after the undercover agent conducted the controlled sale and delivered to Defendant the sham cocaine while he was in the F-150, Defendant was ordered to stop by police officers in a marked police vehicle (from which it can be reasonably inferred that Defendant knew they were police officers), he did not follow the officer's commands, fled and a hot pursuit ensued immediately after Defendant exited DD4 and drove away in the F-150 (from which it can be reasonably inferred that the lives of Defendant, the law enforcement officers and others were put in danger). From these facts, as narrated in the affidavit as to Defendant's flight after exiting DD4 and seeing the law enforcement officers, when coupled with the observations of the agents during the delivery of the kilos of sham cocaine to Defendant while he was in the Ford-150 as also included in the affidavit, the issuing Magistrate Judge correctly found there was a nexus between Defendant's drug trafficking activities and DD4.[10]

e. *"The F-150 was then found abandoned in San Lorenzo; the two duffle bags*

10 The R&R uses the word "evade" instead of "fled." Even though "evade" and "flee" may be considered synonyms, they are different words with different connotations in the legal community. The word "flee" in everyday language and law, considering the totality of circumstances in this case, would have been a more accurate choice of word in the R&R because it reflects exactly what the issuing Magistrate Judge read. From the word "fled" which was the one used in the affidavit, the issuing Magistrate Judge could have reasonably inferred that Defendant was fleeing from justice, after the commission of the offense and after entering and exiting DD4, with intent to avoid arrest and detention. See United States v. Isler, 429 F.3d 19, 25 (1st Cir. 2005) (evidence of flight supporting inference of guilt included attempt to leave building after police entered and engaging in a "violent struggle" with officers while "attempting to force their way past" police); United States v. Carpenter, 403 F.3d 9, 12 (1st Cir. 2005) (evidence of flight supporting inference of guilt included that defendant "recklessly ... fled a traffic stop, r[a]n from his wrecked vehicle, and engaged the police in a life-threatening foot pursuit across a busy interstate highway"); United States v. Concepción-Guliam, 62 F.4th 26, 34 (1st Cir. 2023) ("Evidence of flight may form a basis for an inference of consciousness of guilt.").

*'given to' him were found on the ground near the F-150. Id. at ¶17. This is the first mention of these 'duffle bags.' It is not communicated whether these duffle bags were full, empty or somewhere in between."* (ECF No. 175, p. 22). A review of the affidavit shows that it states the following as to this portion in paragraph 17: "Officers continued to search for VEHICLE 1 in San Lorenzo, eventually locating VEHICLE 1 near Cam Cachet Road (18.217855,-65.970490). As officers approached VEHICLE 1, officers observed the **same** two duffle bags given to CUEVAS on the ground near VEHICLE 1. CUEVAS was not found." (emphasis ours) (ECF No. 175-1, p. 7). Even though it is correct this is the first mention in the affidavit of the duffle bags, the highlights in the R&R as to this portion of the affidavit omit the word "same." From the words "**same** two duffle bags given to CUEVAS," as indicated in the affidavit, the issuing Magistrate Judge could reasonably infer these two duffle bags which were later abandoned and recovered by the officers were the same, identical and unchanged duffle bags which the undercover agent delivered to Cuevas some minutes earlier with the 50 kilos of sham cocaine. Thus, from an ordinary reading of the affidavit, the comment in the R&R that "[i]t is not communicated whether these duffle bags were full, empty or somewhere in between" is inapposite.

f. *"CCTV footage obtained by law enforcement shows that Cuevas exited the F-150 and boarded a Honda Pilot driven by Nieves. The affidavit does not*

*mention any illegal – or even a bag – on the person of Cuevas depicted in the CCTV footage. Cuevas returns to DD4 in the Pilot, now with Nieves. Id. at ¶19. They enter the home together and leave after a short time. Id. at ¶19-20. Once again, the affidavit does not say that anything illegal – not even a bag – was seen on Cuevas' person when he entered or exited DD4. They enter the Pilot and drive away."* (ECF No. 175, pp. 22-23). The fact that the affidavit does not mention any illegal item, or even a bag, on the person of Cuevas when he boarded Vehicle 2 (the Honda Pilot) is of no importance to the nexus analysis because the law enforcement officers had already located the two abandoned duffle bags filled with the sham cocaine which were the same which had been delivered to Defendant previously as stated in paragraph 17 of the affidavit. This information showed to the issuing Magistrate Judge that Defendant boarded a different vehicle driven by his wife, went once again to DD4, and entered the residence during the immediate aftermath of the drug transaction. Remember that the search warrant for DD4 authorized by the issuing Magistrate Judge was not seeking the seizure of drugs but other items related to the drug trafficking activities as itemized in Attachment B.

Then, the R&R concludes as follows: "[e]ven under a deferential standard, there is no evidence of contraband coming into or out of DD4." (Id., p. 23). In addition, it concludes that "[h]ere, the only connection between the drug trafficking activity and DD4 is Cuevas' brief presence at the home in the aftermath of the drug transaction." Id.

The Court agrees with the government that the totality of circumstances set forth in the affidavit including its attachments with the specific items being sought supplied the required nexus. In issuing the search warrant for DD4, the issuing Magistrate Judge reviewed the supporting affidavit that contained the following information the police knew about Defendant at the time they applied for a search warrant for DD4: Defendant was in Vehicle 1 (Ford-150) when he received fifty kilograms of sham cocaine from an undercover agent while he was wearing a black shirt, black pants and a black balaclava covering part of his face; communications between the co-conspirators were conducted by cell phones; Defendant then drove directly in Vehicle 1 to DD4 and entered DD4; Defendant stayed in DD4 for 10 minutes, exited DD4 in Vehicle 1 and fled from the police officers (who were in a marked patrol car), a pursuit ensued leading the officers to San Lorenzo where the officers observed the same two duffle bags given to Defendant on the ground near Vehicle 1; Defendant was not found; CCVT footage then showed Defendant exiting Vehicle 1 and boarding Vehicle 2 which was driven by Defendant's wife; they both drove in Vehicle 2 and arrived at DD4; Defendant and his wife exited Vehicle 2 and entered DD4 (a second time); shortly thereafter Defendant and his wife exited DD4 and entered into Vehicle 2; they started driving around the area of DD4; the officers briefly lost sight of Vehicle 2; a short time later the law enforcement officers saw Vehicle 2 return to DD4 (a third time) only with Defendant's wife; a resident of one of the houses near DD4 complained about a suspicious person who was attempting to break into his house; officers began to search the area of DD4 and its surrounding area; officers observed a

garage door opening from a house behind DD4; Defendant exited the garage of that house and was arrested; residents later confirmed that Defendant jumped the fence and knocked on the door asking the resident to open the garage door so that he could flee for a second time; officers later confirmed that a key found in Defendant's person was the key of Vehicle 1; records of the urbanization where DD4 is located showed Vehicle 1 is registered to Defendant as the driver for purposes of having access to the community; and the affiant's training and experience concerning evidence commonly maintained by individuals engaged in narcotics trafficking in their residences as specified in Attachment B, which did not include kilos of sham cocaine nor the duffle bags. (ECF No. 175-1, pp. 24-29).

These facts contained in the affidavit constitute "specific observations" or facts that would connect Defendant's drug dealing and DD4, as required by Román, 942 F.Supp. at 52 in addition to the "general observations" of the affiant's experience. Defendant's behavior after the controlled buy of the 50 kilograms of sham cocaine is especially probative of the relationship between his drug dealing and DD4. DD4 was Defendant's hub immediately after the commission of the offense as he was seen coming in and out of said residence. The events that transpired after the drug transaction continuously evolved around DD4 which is where Defendant went immediately after receiving the sham cocaine, then returned for a second time after fleeing from the officers and later his wife went by herself. Under the deferential standard, the Court concludes that the issuing Magistrate Judge did not err in concluding there was a reasonable probability that

evidence of Defendant's criminal activity would be found at DD4.[11] It could reasonably be inferred that Defendant used DD4 to seek refuge and communicate with other co-conspirators; to get or leave items; to access resources; to conceal evidence; to change his appearance; to evade capture; to keep large amounts of cash; to secure evidence, or otherwise advance or conceal the operation.

Thus, the specific facts laid out in the affidavit, including Defendant's movements which established the relationship between the commission of the offense and DD4, along with the affiant's oath regarding his training and experience, gave the issuing Magistrate Judge the understanding that there was a fair probability that evidence of drug offenses would be found at DD4. "[T]he probable cause inquiry requires only a "fair probability" - not certainty- that evidence of a crime will be found in a particular location. See, e.g., Feliz, 182 F.3d at 86 (citation omitted). Moreover, the court is tasked with making a judgment based on what appears within the four corners of the affidavit." United States v. Tanguay, 787 F.3d 44, 53 (1st Cir. 2015).

In sum, a commonsense reading of the four corners of the affidavit in support of the search warrant of DD4 and applying the deferential standard, the Court finds it combined generalized observations with "specific observations" connecting Defendant's drug trafficking activities to DD4. Considering the entire content of the affidavit, there was a "fair probability" that evidence of a crime would be found in DD4. Thus, there was

11 "The probable-cause nexus between enumerated evidence of the crime and the place 'can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime].'" Ribeiro, 397 F.3d at 48 (quoting Charest, 602 F.2d at 1017); United States v. Rodrigue, 560 F.3d 29, 32 (1 st Cir. 2009) (same).

a proper nexus and the search warrant for DD4 was properly authorized. The issuing Magistrate Judge's determination of probable cause is entitled to great deference. See Gates, 462 U.S. at 236.

Moving to the second step under Franks, 438 U.S. at 171-72, that the omissions were "necessary to the finding of probable cause", the R&R concludes that whatever "smidgin" of probable cause otherwise existed was vitiated by two alleged omissions in the affidavit. The first alleged omission identified in the R&R is that "the affiant omitted that Cuevas, upon arriving at DD4 after the drug transaction, did not bring either of the two duffel bags with sham cocaine with him into the residence. Exhibit I, at 4-6. Nor did he bring any bags whatsoever, such that agents might suspect that he had contraband on him. Id." (ECF No. 175, p. 24). The second alleged omission mentioned in the R&R is that: "It was also omitted from the search warrant that both duffle bags of sham cocaine were recovered, with the full amount of sham cocaine still inside them, in the area where Cuevas abandoned the F-150 in San Lorenzo. Id." (Id.). The R&R then concludes that there was no reason for law enforcement agents to think they would even find a few bricks of sham cocaine in DD4. (Id.).

The Court agrees with the government that the R&R's omission analysis of the affidavit is based on an erroneous premise. The Court quotes the government's analysis as to this matter:

> … The omission analysis is based upon a fundamentally erroneous premise. The affidavit did not conceal the disposition of the duffel bags. Namely, paragraph 13 of the search warrant affidavit disclosed that fifty kilograms of sham cocaine were delivered to Defendant as part of the controlled drug

> transaction. Joint Exhibit I at 6. Paragraph 17 then identified that agents recovered the same two duffle bags near the F-150 in San Lorenzo as "**the same two duffle bags given to CUEVAS.**" *Id. at 7.* The ordinary reading of those paragraphs is that officers recovered the same instrumentalities used in the controlled delivery. Nothing in the affidavit stated or implied that Defendant carried either bag into DD4 or that some portion of the sham cocaine was missing. Put simply, whether agents expected to find bricks of sham cocaine at DD4 was never a relevant probable cause inquiry. The Government was never seeking authority to search the DD4 property for the sham cocaine or the drugs themselves. In fact, the sham cocaine was not listed as an item law enforcement was seeking as part of the search warrant. *See* Joint Exhibit I at 8-19.
>
> The DD4 warrant sought other evidence associated with Defendant's drug trafficking activities. Recovery of the sham cocaine elsewhere establishes the location of that item; it does not establish that no other evidence of the crime would be found at DD4. *See, e.g., United States v. Angulo-Lopez,* 791 F.2d 1394, 1399 (9th Cir. 1986) (holding that direct evidence that contraband or evidence indicating drug trafficking is at a suspect's residence is not essential to establish probable cause); *United States v. Thomas*, 989 F.2d 1252, 1255 (D.C. Cir. 1993) (per curiam) (observations of drug trafficking occurring away from suspect's residence can provide probable cause for search of house). The nexus in this case rests on Defendant's direct trip to DD4 immediately after the drug transaction and his return to DD4 after flight from law enforcement. These facts created a fair probability that evidence associated with that criminal event - including evidence expressly identified in Attachment B - would be found inside DD4. (emphasis in original).
>
> (ECF No. 185, pp. 14-15).

Consistent with the analysis above performed herein as to the nexus, which is based on the totality of the affidavit, and the government's analysis above quoted, the Court finds the two alleged omissions identified in the R&R are not relevant to the probable cause inquiry to search DD4. As previously mentioned, the affidavit stated in paragraphs 13 and 17 that the law enforcement officers delivered 50 kilograms of sham cocaine to Defendant and they found the **same** two duffle bags given to Defendant on the

ground near Vehicle 1, prior to requesting the search warrant. (ECF No. 175-1, pp. 6-7). Thus, it was clear from the affidavit before the issuing Magistrate Judge that the law enforcement agents never expected to find bricks of sham cocaine in DD4 when they pursued the search warrant because they had already recovered in San Lorenzo the same two duffel bags filled with the sham cocaine. The law enforcement agents were seeking other items related to Defendant's drug trafficking activities as listed in Attachment B of the affidavit. As a matter of fact, sham cocaine was not listed as an item being sought in DD4's search warrant, as previously mentioned.

If the Court were to add to the affidavit the two alleged omissions, they would not vitiate probable cause to search DD4. Even if information that Defendant entered DD4 without either bag or any other bag and that he abandoned the F-150 truck in San Lorenzo where the same duffel bags containing the fifty kilograms of sham cocaine were recovered would have been included in the affidavit, that information would not have led the issuing Magistrate Judge to a finding of no probable cause to search DD4. As previously stated, DD4's search warrant was not seeking drugs but other items (not the two duffle bags with the sham cocaine) related to Defendant's drug trafficking activities as clearly laid out in the affidavit.

Moreover, considering the above conclusion, the R&R's finding that "the omitted information was withheld recklessly because each of these facts were known or with reasonable diligence should have been known, to the FBI at the time they sought the search warrant for DD4" (ECF No. 175, p. 25) holds no water and is rejected. On this

record, there is no evidence that the alleged omissions were made intentionally or with reckless disregard or that they misled the issuing Magistrate Judge. The affidavit, which sought other items related to Defendant's drug trafficking besides the two duffle bags, accurately described Defendant's actions after the controlled delivery, his movements to and from DD4 after fleeing from the agents and the recovery of the duffle bags with the sham cocaine. Thus, it has not been proven, by a preponderance, an intentional or reckless falsehood or omission material to probable cause.

The government argues, alternatively, that even if there were no probable cause for the search warrant, the evidence should not have been suppressed because of the good-faith exception of León, 468 U.S. at 913. Because the Court finds that probable cause existed, it need not reach that alternative argument. See Ribeiro, 397 F.3d at 52 n. 7.

In a nutshell, the Court finds the issuing Magistrate Judge, a detached judicial officer, properly found with respect to the nexus element that, given all the circumstances set forth in the affidavit before him, there was a fair probability that contraband or evidence of Defendant's drug trafficking crime would be found at DD4. Feliz, 182 F.3d at 86.

Thus, applying the required deferential standard and upon a de novo review, the Court REJECTS the portions of the R&R objected by the government that recommend suppressing any items seized from DD4 and the Colorado because of the execution of the search warrant for DD4 allegedly lacked a nexus between Defendant's drug trafficking activities and DD4.

## CONCLUSION

As required by 28 U.S.C. § 636(b)(1)(C), upon an independent review of the record under the applicable standard, the parties' objections to it (ECF Nos. 185 and 192), and having conducted its own research and analysis on the issues presented for the Court's consideration, the R&R (ECF No. 175) is ADOPTED IN PART AND REJECTED IN PART as follows:

- The Court ADOPTS all the portions of the R&R that Defendant objects.
- The Court REJECTS the portions of the R&R that the government objects which recommend suppressing any items seized from DD4 and the Colorado.

Accordingly, "Defendant's Motion to Suppress Evidence Seized from the Residence and Chevrolet Colorado and Memorandum of Law in Support thereof" (ECF No. 114) is DENIED.

IT SO ORDERED.

In San Juan, Puerto Rico, this 20th day of October of 2026.

s/ CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES DISTRICT JUDGE